**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 26, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

YANCY LYNDELL DOUGLAS,

      Petitioner-Appellant,

v.

RANDALL G. WORKMAN, Warden,
Oklahoma State Penitentiary,

      Respondent-Appellee.

_____

PARIS LAPRIEST POWELL,

      Petitioner-Appellee/
      Cross-Appellant,

v.

RANDALL G. WORKMAN,[*] Warden,
Oklahoma State Penitentiary,

      Respondent-Appellant/
      Cross-Appellee.

Nos. 01-6094
& 06-6091

Nos. 06-6093
& 06-6102

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(Douglas D.C. Nos. CV-99-75-C and CV-02-101-C;**

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Randall G. Workman is substituted for Marty Sirmons as Warden of the Oklahoma State Penitentiary, effective December 15, 2008.

*Cases Argued Separately But Combined on Disposition:*

Randy A. Bauman, Assistant Federal Public Defender, Oklahoma City, Oklahoma (John M. Stuart of Stuart, Frieda & Hammond, P.C., Duncan, Oklahoma, with him on the briefs), for Petitioner-Appellant Douglas.

Robert L. Whittaker, Assistant Attorney General (W.A. Drew Edmondson, Attorney General, with him on the briefs), State of Oklahoma, Oklahoma City, Oklahoma, for the State.

Jack Fisher of Edmond, Oklahoma, for Petitioner-Appellee/Cross-Appellant Powell.

Before **HENRY**, Chief Judge, **SEYMOUR**, and **EBEL**, Circuit Judges.

Per Curiam.

Following the death of Shauna Farrow and the wounding of Derrick Smith, Yancy Lyndell Douglas and Paris LaPriest Powell were each convicted of first degree malice murder and shooting with intent to kill. Mr. Douglas and Mr. Powell were tried separately, almost two years apart,[1] and both juries found that their respective defendants knowingly created a great risk of death to more than one person. Both juries also assessed the death penalty to their defendants for the murder of Shauna Farrow, and sentenced them to life imprisonment for the

_____

[1]The cases were severed for trial. Mr. Douglas was tried in October 1995. Mr. Powell was tried in May 1997.

shooting of Derrick Smith. Smith was the key witness at both trials.

Both defendants exhausted their state court remedies. *Douglas v. State*, 951 P.2d 658 (Okla. Crim. App. 1997) (*Douglas I*) (direct appeal); *Douglas v. State,* 953 P.2d 349 (Okla. Crim. App. 1998) (*Douglas II)* (collateral review); *Powell v. State*, 995 P.2d 510 (Okla. Crim. App. 2000) (direct appeal) (*Powell I*); *Powell v. State*, PCD-1999-719 (Okla. Crim. App. Mar. 17, 2000) (*Powell II*) (collateral review). The defendants then initiated federal habeas proceedings.

In his federal habeas petition filed on August 2, 1999, Mr. Douglas asserted that numerous constitutional errors infected his trial. The district court denied the petition. *Douglas v. Gibson*, No. CIV-99-75-C (W.D. Okla. Jan. 10, 2001) (*Douglas III*). Before Mr. Douglas's appeal was heard in this court, however, Smith recanted his identification of Mr. Douglas and Mr. Powell and alleged that the prosecuting attorney, Brad Miller, had suborned perjured testimony from him, which he provided in exchange for favorable treatment, and that Miller had also elicited false testimony from him denying the existence of any deal for his testimony. On December 12, 2001, we granted Mr. Douglas's request to file a second habeas petition pursuant to 28 U.S.C. § 2244 (b)(3)(c) and we abated his pending appeal of the first petition.[2]

_____

[2]When we briefly reviewed Mr. Douglas's petition for permission to file a second or successive § 2254 petition, we concluded he had made a prima facie showing that he could meet the requirements of § 2244(b)(2), and we remanded

(continued...)

On September 20, 2001, Mr. Powell filed his federal habeas petition incorporating allegations concerning the newly discovered evidence. After a joint evidentiary hearing was held on the new allegations in the Douglas and Powell petitions, the district court granted Mr. Powell's petition[3] and denied Mr. Douglas's.[4]

On appeal, Mr. Douglas asserts, *inter alia*, due process claims relating to the prosecutor's egregious conduct when he vouched for the credibility of the key witness, Derrick Smith, by using false testimony he elicited from Smith, suppressed exculpatory evidence of his agreement to assist Smith with his numerous legal difficulties in exchange for his favorable testimony, and failed to correct Smith's false testimony that no deals were made. The State of Oklahoma appeals the grant of Mr. Powell's petition, and Mr. Powell cross-appeals the

---

[2](...continued)
the matter to the district court to determine whether the petition did in fact satisfy the requirements of that section. *See* 28 U.S.C. § 2244(b)(3)(C) ("The court of appeals may authorize the filing of a second of successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection."). Rather than review Mr. Douglas's claim under § 2244(b)(2), the district court proceeded directly to the merits of the claim. Mr. Douglas's appeal of that determination gives us another opportunity to assess whether his claim is second or successive. As discussed *infra*, we have concluded that it is not.

[3]*Powell v. Mullin*, No. CIV-00-1859-C (W.D. Okla. Jan. 31, 2006) (*Powell III*).

[4]*Douglas v. Mullin*, No. CIV-02-101-C (W.D. Okla. Jan. 31, 2006) (*Douglas IV*).

conditional nature of the writ granted to him. We consolidated the appeals. We affirm the district court's order granting Mr. Powell conditional habeas relief. We reverse the district court's refusal to grant habeas relief to Mr. Douglas, and we remand to the district court with instructions to grant the writ as to Mr. Douglas's convictions and sentence, subject to the State's right to retry him.

# I

## The Murder[5]

Derrick Smith, a member of the Southeast Village Crips, spent the afternoon and evening of June 24, 1993, with his friends at the Ambassador Court Apartments in Oklahoma City. Smith, then seventeen, was drinking alcohol and smoking numerous marijuana joints with his gang associates. Fourteen-year-old Shauna Farrow was also at the apartment complex. Around 11:00 p.m., Smith began riding his bike home. When he caught up with Farrow, who had left shortly before, he dismounted his bike to walk along with her. Other than the light from nearby porch lamps, it was a dark night.

According to Smith's testimony at the trials, he and Farrow were passed from behind by a grey Datsun hatchback playing loud rap music. The car turned

---

[5]To the extent possible, this narrative draws upon uncontested facts from testimony at the Douglas and Powell trials, or from the findings of the federal district court after its evidentiary hearing.

around at the end of the block and came slowly back toward them, the music no longer playing. Just as the car passed Smith and Farrow, it stopped and the driver's side door opened. Smith saw the driver and front passenger were crouched forward, as though to let the rear passenger exit the car.[6] Smith saw something chrome in the driver's hand aimed at him, and then saw flashes as gunfire came from the car's occupants.

Smith was hit once in the left hip and fell over his bicycle onto the nearby grass. Farrow was backing away with her hands raised when she was hit in the chest and killed. When Smith saw Farrow collapse, he glanced quickly at the car, saw continued gunfire, and buried his face in the ground and closed his eyes. Smith was carrying a loaded .380 semiautomatic pistol; however, he was so inebriated that he forgot he was armed. After the shooting stopped, Smith heard the car door shut and one of the shooters say "Fuck 'em" as the car drove away. Smith testified at trial that he recognized the voice as Mr. Douglas's.

Smith crawled behind a camper trailer parked in a nearby driveway. From there, he testified he saw the assailants' car stop at a driveway seven houses down the street. The car doors opened and closed again, and the car drove away. As

---

[6] Both Smith's identification of the car and identification of the occupants of the car varied. As detailed below, Smith has at various times identified various individuals, including both Yancy Douglas and Paris Powell, as being occupants of the car. Smith has made inconsistent statements about the number of occupants in the car as well. His description of the make and model of the vehicle has been similarly inconsistent.

Smith was crawling, a bag of crack cocaine fell out of his pocket. Smith threw his gun into the backyard of the house and laid in the yard between the houses until the police and ambulance arrived. Later investigation of the crime scene revealed bullets and casings from three different weapons used in the assault. Smith's weapon was never recovered.

Earlier on the night of June 24, LaDana and Winter Milton and their friend Ebony Rhone saw Yancy Douglas and other members of the 107 Hoover Crips at Pitts Park. The young men were excited and were talking of shooting someone on the south side of Oklahoma City. The girls watched Mr. Douglas leave the park in a two-door hatchback. As he left, he fired his gun out of the window of the vehicle.

Between 12:00 and 1:00 a.m. on June 25, Yancy Douglas drove Paris Powell to the home of Lawrence Kuykendoll. Mr. Powell had been shot in the left hand, and Kuykendoll took him to the hospital. Mr. Douglas left Kuykendoll's home in the blue two-door Plymouth hatchback in which he and Mr. Powell had arrived. Mr. Powell was hospitalized for two days and then released into police custody. On the afternoon of June 25, Mr. Douglas drove the blue hatchback to Leon Washington's body shop, apparently at Mr. Powell's request. *Douglas IV* at 21.

### Pre-Trial Developments

Smith made several statements to the Oklahoma City police shortly after

the shooting. At 12:50 a.m. on June 25, he told Officer Williams that four black men in a four-door blue or grey Datsun shot at him and Farrow, and he identified Paris Powell, a member of the 107 Hoover Crips, as the car's driver. Before his surgery later that day, Smith repeated to Detective Mullenix his identification of Mr. Powell as the driver, although Smith said he was only fifty percent certain Mr. Powell was in the car. He also told Detective Mullenix that Anthony Hishaw and Yancy Douglas were passengers in the car. Finally, shortly after his surgery, Smith gave Officer Dycus several conflicting versions of the previous night's events. First he stated that Mr. Powell was driving the vehicle, then that Mr. Douglas was. Smith also said he believed the car was Hishaw's and that Hishaw was in the vehicle the night of the shooting. Hishaw was, in fact, in prison on June 24 and 25, 1993. Smith testified he had seen Mr. Powell in the vehicle before as well. He told Officer Dycus he thought there were seven or eight people in the car, but then changed his story when the officer said he did not believe Smith was telling the truth. Smith finally said there were four occupants, that Mr. Powell was driving, that Mr. Douglas was in the front passenger seat, and that there were two other passengers he could not identify. In none of his statements to the police did Smith mention the car stopping in a nearby driveway.

At the preliminary hearing on August 27, 1993, Smith testified in a manner largely consistent with what his later trial testimony would be: that he was certain Mr. Powell was the driver and one of the shooters, that the car stopped in a

-8-

driveway up the street from the shooting, and that he guessed the car stopped to allow a change of driver. However, Smith described the assailants' car as a grey Datsun with black louvers on the rear window. Based on how the car sounded as it drove away, Smith was certain that it had a standard transmission. At the time of the preliminary hearing, the police had not located the vehicle used during the shooting.

At the time of the shooting, Smith was facing pending charges in a 1992 cocaine trafficking case. By the time of the preliminary hearing for Mr. Powell and Mr. Douglas in August 1993, Smith had also been charged with throwing a rock at a police car. As part of a plea bargain, Smith pled guilty in the drug case on February 1, 1994, receiving a sentence of 10 years on a reduced charge of possession with intent to distribute, while the charge in the rock throwing incident was dismissed. *Powell III* at 6. In June 1994, after serving four months of his ten-year sentence, Smith was released on pre-parole under the supervision of the Oklahoma Department of Corrections (ODOC). *Id.* Smith's pre-parole status was revoked, however, and he was reincarcerated after he was arrested in September 1994 for receiving stolen property. *Id.*

In March 1995, the police located the vehicle they believed was driven by the assailants on the night of Farrow's murder. The vehicle that would become State Trial Exhibit 2 was not a grey Datsun with black rear-window louvers, standard transmission, and a loud stereo, but rather a light blue Dodge Omni with

no window louvers, an automatic transmission, and no stereo.

Also in March 1995, Smith became aware that he would again be considered for pre-parole release during the parole board's July 1995 docket. A parole board investigator interviewed Smith on May 22, 1995, in preparation for the July review, but issued a negative recommendation on pre-parole based on Smith's history of reincarceration and failure to complete prison programs.

In final preparation for Mr. Douglas's trial, Assistant District Attorney Brad Miller, who would prosecute both Mr. Douglas and Mr. Powell, issued a writ of *habeas corpus ad prosequendam* for Smith, releasing him from ODOC custody so he could testify about the shooting. Miller wrote a note in his file on May 25, 1995, three days after Smith's pre-parole investigation interview, noting that he had caused the writ to issue and stating that he had spoken to Smith about the murder case. This was apparently Miller and Smith's first contact regarding the Douglas and Powell trials.

### Mr. Douglas's Trial

Mr. Douglas's trial began on June 20, 1995, with Miller as the lead prosecutor. Smith's testimony, and, in particular, his identification of Mr. Powell and Mr. Douglas as the shooters, was the "linchpin" of the prosecution's case.[7]

---

[7]Although Smith was certainly the prosecution's key witness, the State also presented the testimony of Ebony Rhone, Winter Milton, and LaDana Milton, who placed Mr. Douglas in the car identified at trial as State Trial Exhibit 2 at Pitts

(continued...)

-10-

*Douglas IV* at 21.  For example, he identified State Trial Exhibit 2 as the car driven by the shooters despite the apparent inconsistencies with his prior descriptions of it.[8]  Miller elicited testimony from Smith denying there was any deal for Smith's testimony or even any discussions of help from the District Attorney's office.  On cross-examination, Smith further denied any quid pro quo for his testimony, including a denial that he expected Miller to write a letter to the parole board approving his application for pre-parole status.  Indeed, on redirect, Miller elicited further testimony that Smith never asked Miller to help him and that Smith received no special treatment on the charges he faced prior to Douglas's trial.

Mr. Douglas presented an alibi defense at trial.  He testified that he spent the day of the shooting at his mother's apartment, leaving only after midnight when two fellow members of the 107 Hoover Crips drove Paris Powell to his

---

[7](...continued)
Park on the evening of Farrow's murder.  An additional portion of important testimony is that of Andrea Laster, who testified at both trials to having seen Mr. Douglas in the same car the day before the shooting, driving through the Ambassador Court Apartments and brandishing a gun.  Andrea and her sister Jackie, who did not testify at either trial, subsequently executed affidavits contradicting Andrea's identification of the car at trial and suggesting that Miller abused his authority to coerce testimony they had told him was false.  Evid. Hr'g Exs. 9, 31; *see* Evid. Hr'g Tr. 310-11.  The Lasters allege Miller repeated his coercive tactics in Mr. Powell's trial.  *See* Evid. Hr'g Tr. 272-73; Evid. Hr'g Ex. 31.

[8]Smith acknowledged in his testimony that he identified the car after being shown only one photograph of it.

house and told him that Mr. Powell had been shot. Mr. Douglas testified that he got into their car with Mr. Powell, who asked Mr. Douglas to drive him to Lawrence Kuykendoll's house so that Kuykendoll could take Mr. Powell to the hospital. After dropping him off, Mr. Douglas testified that he spent the night at Kim Barnett's house, arriving sometime after midnight. He also testified that the next day Mr. Powell contacted him by pager and asked him to take the car to Leon Washington's body shop. Mr. Douglas did so that afternoon and was arrested later the same day.

In his closing argument during the guilt phase of Mr. Douglas's trial, Miller emphasized that Smith's testimony was trustworthy because there was no quid pro quo between Smith and Miller. Miller pointed to the ten-year sentence Smith received on the reduced distribution charge as evidence there was no deal, and contended Smith's admission that he was carrying drugs and a gun when he was shot indicated there was no deal. Miller then implored the jury members to

> ask yourself if you have seen anything that would indicate to you that anybody's trying to convict someone that's not guilty, trying to be unfair. Ask yourself again, do you think we don't have enough to do over there in the D.A.'s office not to try to work this hard to convict someone that's innocent?

Douglas Trial Tr. at 1870-71. Miller made a number of additional comments during his cross-examination and his guilt-phase closing argument with which Mr. Douglas takes issue in his habeas petition and this appeal; these statements will be more fully reviewed in the context of the prosecutorial misconduct challenges

-12-

Mr. Douglas asserts.

Following the guilt-phase closing arguments and the court's instructions, the jury convicted Mr. Douglas of one count of murder in the first degree, OKLA. STAT., tit. 21 § 701.7(A), and one count of shooting with intent to kill, OKLA. STAT., tit. 21 § 652. It then considered whether a death sentence was appropriate.

During the penalty phase of Mr. Douglas's trial, the prosecution sought to prove aggravating circumstances, including that Mr. Douglas "knowingly created a great risk of death to more than one person" and "the existence of a probability that [Mr. Douglas] would commit criminal acts of violence that would constitute a continuing threat to society," pursuant to OKLA. STAT. tit. 21 § 701.12(2) and (7). *Douglas I*, 951 P.2d at 658 n.1. Mr. Douglas, in turn, presented mitigating evidence, including the testimony of Dr. Herman Jones, a psychologist who had examined him in 1992 to determine his amenability to rehabilitation in connection with a juvenile offense, but who had not seen him since that time. *Id.* at 680. Based in part on Jones's testimony, defense counsel argued that Mr. Douglas did not pose a continuing threat. *Id.*

In his closing arguments at the penalty phase, Miller made further comments to which Mr. Douglas objects. Of particular note, Miller told the jury that "[n]one of us has the job of sometime in the future carrying out the execution. There are other people that do that, if it ever happens. Your job is simply to make a decision with as much neutrality as you can about what's

-13-

appropriate in this case." Douglas Trial Tr. at 2362. Discussing unadjudicated acts which he argued supported the continuing threat aggravating factor, Miller suggested to the jury that

> if you think for a minute that [Mr. Douglas] had — he had an excuse for any of these acts of misconduct, could he really show that he was actually physically, factually not guilty of something, anybody doubt that he would have done that? . . . Bottom line, he couldn't prove he wasn't guilty because he was guilty.

*Id.* at 2364. In addition, discussing a potential witness to one of these unadjudicated acts who refused to testify, Miller noted that

> Charles McGee didn't come in here. You know how difficult it is. You've heard from officers how difficult it is to get these people to cooperate with the police, even if they've been shot. There's an example. Nevertheless, it doesn't diminish — just because no one will cooperate — it doesn't in any way diminish [Mr. Douglas's] tendency toward violence and the proof that allows for his probability of violence in the future in whatever society that he's in.

*Id.* at 2314. And while discussing another unadjudicated act — a gang fight at the Crossroads Mall in which Mr. Douglas allegedly participated — Miller asked the jury, "Anybody know where they were 3-7 of '92? . . . I don't know where I was, but I could have been at Crossroads. My little kids could have been at Crossroads." *Id.* at 2316.

The jury agreed on two aggravators, the great risk of death to more than one person and the continuing threat to society. They recommended a sentence of death for the charge of first degree murder and life imprisonment for the charge of shooting with intent to kill.

-14-

**Post-Trial Developments and Mr. Powell's Trial**

Just one day after Mr. Douglas's trial concluded, Miller sent a letter to the

parole board in support of Smith's application for parole from his ten-year

sentence for cocaine possession. *Powell III* at 7. In the letter, Miller maintained

that his "office gave [Smith] no special treatment in his case. However, he was

required to testify at [the] preliminary hearing and the trial of Yancy Douglas. . . .

[H]e has fully cooperated and truthfully testified in both instances." *Id.* Lauding

Smith for "[standing] up like a responsible citizen," the letter stated Smith was

motivated by the "wrongness of Shawna's [sic] death." *Id.* Miller maintained he

had no agreements with Smith but noted that Smith understood "that he will be

required to testify in Paris Powell's trial," as well. *Id.* at 7-8. Smith was once

again granted pre-parole status and released in October 1995. *Id.* at 8. Smith

again violated the terms of his release and was reincarcerated in February 1996.

On April 20, 1997, still in ODOC custody, Smith wrote a letter to his

mother. *Id.* at 8-9. In it, Smith asked her to contact Miller about his

confinement:

> What's up Momma? Have you been calling Cuz? Probably not man
> call O Dude and get that hook up to where I can come home from the
> county jail or tell him he's short because I ain't gone let him put me
> in the cross again like he did last time, but he ain't gone to do shit if
> ya don't continue to call him and let him know what's going on, it's
> fifteen days before the trial starts and I don't wanna be up in that
> county jail if he ain't talking write. Tell 'em I want 365 days for
> helping the state to kill some body cause that's what he plans to do. .
> . . Stay own brad miller and I'll Holler at you'll later.

*Id.* On April 23, 1997, Brad Miller received a call from the home of Smith's aunt, whose phone Smith's mother commonly used. Apparently in response to the call, Miller telephoned David Petite, a sentence administration auditor at ODOC. Miller wrote the following notes regarding the call: "Warden Ron Ward"; "Derrick Smith"; "coop credits"; and "with credits -> 225 days = 11/11/97." *Id.* at 9. None of this was disclosed to the defense.

Mr. Powell's trial on charges of first degree murder and shooting with intent to kill began one week after Miller's call to ODOC. *Id.* Smith was again the State's key witness, identifying Mr. Powell and Mr. Douglas as the shooters and State Trial Exhibit 2 as the car they drove. Over defense counsel's objection, Miller elicited testimony from Smith that he had not "receive[d] any benefit, any sort of help on [Smith's unlawful possession] case as a result of what happened to [him] in this case." Powell Trial Tr. at 1066. Miller further elicited a denial from Smith that at no time during the pendency of the Douglas and Powell charges had Smith requested any help from Miller. During closing arguments, Miller argued Smith's credibility in these terms:

> He came to court, he followed the law, he never tried to retaliate, he told what he knew, he told the truth. He went to prison on his own case *and never asked for a thing. . . .* He got a ten year to do [sic] sentence at 17 years of age for having some cocaine on him. He got whacked. *And nobody interceded because he didn't want it that way.*

*Id.* at 1612 (emphasis added). Mr. Powell was convicted on both counts. Upon

-16-

the jury's finding that he had knowingly created a great risk of death to more than one person, Mr. Powell was sentenced to death on the malice murder charge. He was sentenced to life imprisonment on the charge for shooting with intent to kill.

On June 27, 1997, a little more than a month after Mr. Powell's trial concluded, Warden Boone of ODOC's Alford Correctional Center replied to a letter from Smith, stating that Miller had contacted Boone about merit days and lost credit days for application to Smith's sentence. As Warden Boone had explained to Miller, he informed Smith that the "meritorious earned credit policy . . . was not intended for a reward for testifying in felony cases," so no merit days would be awarded to Smith. Evid. Hr'g Ex. 1C. At the same time, Warden Boone promised to give "serious consideration to the restoration of lost [earned] credits which would discharge [Smith's] sentence." *Id.* On July 24, Warden Boone approved the restoration of 400 days' credit, effectively discharging Smith's sentence. Smith was released by ODOC in August 1997.

**Subsequent Procedural History and Continuing Assistance to Smith**

Both Mr. Douglas and Mr. Powell appealed their convictions to the Oklahoma Court of Criminal Appeals (OCCA) and later pursued state collateral relief. In *Douglas I*, the OCCA affirmed Mr. Douglas's direct appeal of his convictions and sentence in the face of some nineteen asserted propositions of error. 951 P.2d at 681. The asserted errors overlap with grounds Mr. Douglas would later assert in his federal habeas petition, including prosecutorial

misconduct, ineffective assistance of counsel, and failure to instruct claims. *See id.* at 673-74 (prosecutorial misconduct), 678 (failure to instruct), 679-80 (ineffective assistance of counsel). Mr. Douglas raised an additional claim of cumulative error in the original application for postconviction relief that he filed in the OCCA while his direct appeal was still pending. *Douglas II*, 953 P.2d at 352-54. The OCCA rejected the claims Mr. Douglas raised in the state post-conviction collateral proceedings. *Id.* at 354. As with Mr. Douglas, the OCCA later rejected a broad range of claims asserted by Mr. Powell on direct appeal, although none of those claims are currently before this court. *Powell I*, 995 P.2d at 542. The OCCA likewise denied Mr. Powell's application for postconviction relief in an unpublished opinion.

Mr. Douglas filed his initial petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on August 2, 1999, raising ten grounds for relief including the failure to instruct, prosecutorial misconduct, cumulative error, and ineffective assistance of counsel. *Douglas III* (Ground D - failure to instruct); *id.* at 30-49 (Ground G - prosecutorial misconduct); *id.* at 53-54 (Ground J - cumulative error); *id.* at 54-66 (Ground B - ineffective assistance). The district court denied all relief on January 10, 2001. Notably, Mr. Douglas filed a timely Rule 59 motion for a new trial and a motion for time to submit affidavits regarding newly discovered evidence, but these motions were denied. Mr. Douglas then filed a notice of appeal and, simultaneously, motions in the district court for

-18-

reconsideration and to hold the court's decision in abeyance to allow exhaustion of new issues in state court. These motions were likewise denied on March 21, 2001. The district court then granted Mr. Douglas a certificate of appealability (COA).

While Mr. Powell and Mr. Douglas sought relief from their convictions, Smith continued his criminal career and his contacts with Brad Miller, the prosecutor. In October 1997, Smith was arrested for the shooting of Joe Shells and was charged with assault with a deadly weapon in case No. CF-98-1545. Miller dismissed the case against Smith, citing insufficient evidence of identification. In February 1998, Smith committed a drive-by shooting, according to an information filed in case No. CF-98-1162, but Miller approved dropping the charges against Smith, purportedly due to lack of cooperation from the victims. In May 1999, Smith allegedly beat his girlfriend with a baseball bat and was charged in case No. CF-99-3338 with assault and battery with a dangerous weapon. On March 8, 2000, before his trial on the assault charge, Smith was again arrested, and charged in case No. CF-00-1683, this time for trafficking in crack cocaine. On March 16 of that year, even though he was no longer in the district attorney's office, Miller contacted the assistant district attorney prosecuting Smith in the trafficking case to inform him that Smith had testified in the Douglas and Powell trials. While again in jail in July 2000, Smith was arrested on a Texas warrant for a June 2000 murder in Wichita Falls. After his

conviction in the assault case in January 2001 yielded a fifteen-year sentence, Smith was offered a deal in March 2001 on the trafficking charge that resulted in a five-year sentence to run concurrently with his sentence for the assault. This unusually lenient sentence was a result of Miller's call to the prosecuting district attorney. Evid. Hr'g Ex. 32 (affidavit of Smith's counsel in trafficking case).[9] Smith was indicted for the Texas murder charge in October 2001, pled guilty to a reduced aggravated robbery charge in December 2002, and received a twelve-and-a-half-year sentence concurrent with his Oklahoma sentences.

## Smith's Recantation

On May 17, 2001, four months after the district court denied Mr. Douglas's initial habeas petition, Smith executed a handwritten affidavit recanting his identification of Yancy Douglas and Paris Powell as the shooters and asserting that he had received Miller's assistance in exchange for his testimony, contrary to his denials at both trials. Specifically, Smith asserted that he told Miller he was unable to identify any of the shooters and that he would not testify against either Mr. Douglas or Mr. Powell unless Miller provided assistance on Smith's then-pending trafficking case. Evid. Hr'g Ex. 4, at ¶4. Smith stated that, at his request, Miller contacted the parole board in 1995 and Warden Boone in 1997 to

---

[9]In fact, Smith's counsel in that case testified that the assistant district attorney handling the plea would not initially honor the proposed deal, but was eventually convinced otherwise by Miller. Evid. Hr'g Ex. 32.

secure Smith's release from prison.  Miller's assistance continued after the conclusion of both trials, according to Smith's affidavit, including when Miller dismissed an assault charge against Smith in 1998 under the threat by Smith that he would reveal his perjury in the trials.  *Id*. at 3.  A week later, Smith executed a second affidavit containing the same allegations.  Evid. Hr'g Ex. 1.

Given this evidence, on October 29, 2001, Mr. Douglas filed a motion asking us to remand to the district court his pending appeal, docketed as case No. 01-6094.  Alternatively, he sought permission to file a second habeas petition pursuant to 28 U.S.C. § 2244(b)(3)(A), asserting as grounds for relief claims stemming from Smith's recantation and the suppression of impeachment evidence. We determined he had made a prima facie case that his application satisfied the prerequisites of § 2242(b)(2), and we granted him permission on December 12, 2001, to file a second habeas petition in the district court.  We entered an order in No. 01-6094 abating proceedings in the appeal pending disposition by the district court of the second petition.  Mr. Douglas filed the new habeas petition on January 28, 2002.  The district court abated proceedings on that petition on December 2, 2002, to permit Mr. Douglas to return to state court to exhaust new claims.  Mr. Douglas filed an original application for postconviction relief in the OCCA on June 12, 2003.  The OCCA denied relief on procedural grounds on August 7, 2003.

In the meantime, Mr. Powell timely filed his initial petition for a writ of

habeas corpus on September 20, 2001. His first two asserted grounds for relief were based on Smith's recantation and allegations that Miller knowingly had suborned Smith's perjury and suppressed impeaching evidence. Mr. Powell filed a motion seeking to excuse his failure to exhaust these claims or, alternatively, to abate proceedings pending state exhaustion. On December 2, 2002, the district court abated proceedings on Mr. Powell's petition and ordered him to return to state court. Mr. Powell filed a second state application for postconviction relief, which the OCCA denied on procedural grounds on June 11, 2003.

Even as Mr. Douglas and Mr. Powell filed their habeas petitions based on Smith's recantation, however, further developments complicated the picture. On January 17, 2002, Smith executed a third affidavit repudiating his recantation and confirming the veracity of his trial testimony. But on May 16, 2002, Smith executed his fourth affidavit, recanting his repudiation of his recantation and claiming that his third affidavit had been executed at the direction of investigators from the Oklahoma State Bureau of Investigation (OSBI) under the threat of a perjury charge if he did not repudiate his earlier recantations. When Mr. Douglas's habeas counsel learned about the OSBI investigation, he filed a joint application with Mr. Powell's counsel in the district court for a protective order and discovery, alleging that witnesses in petitioners' habeas proceedings were being threatened with prosecution for perjury. Subsequently, on March 26, 2004, counsel for Mr. Douglas and Mr. Powell obtained access for the first time to the

Oklahoma County District Attorney's files on the prosecutions and were finally provided documents that lent support to the factual allegations made by Smith in his recantation affidavits.

**Joint Evidentiary Hearing and District Court's Decisions**

Upon requests from Mr. Douglas and Mr. Powell, the district court held a joint evidentiary hearing on questions raised by Smith's recantation of his trial testimony. Although fifteen witnesses testified at the hearing, of particular importance to the district court was the testimony of Smith and Miller. Smith testified that everything in his first affidavit recanting his trial testimony was true, that he was unable to identify anyone in the car during the shooting because he was intoxicated by marijuana and alcohol and because of the lighting conditions, that his initial indications were prompted by the statements of someone else present at the scene of the shooting, and that he told Brad Miller he could not identify the assailants. *Douglas IV* at 9. Smith also testified that in his first meeting with Miller, Miller mentioned his pending trafficking charge and the crack cocaine Smith had been carrying at the scene of the shooting. Evid. Hr'g Tr., vol. I at 36-37. Smith said he told Miller he would not testify unless Miller helped him on his pending trafficking case. *Douglas IV* at 9; Evid. Hr'g Tr., vol. I at 37-38. Smith reaffirmed the falsity of his trial testimony identifying Mr. Powell and Mr. Douglas as the shooters and denying the existence of a deal between himself and the prosecution. Notably, Smith stated that prior to Mr.

Douglas's trial, he and Miller had discussed Smith's hearing before the parole board and that Miller promised to help, but only after the trial in order to preserve Smith's credibility. Evid. Hr'g Tr., vol. I at 49, 61.

Miller also testified at the evidentiary hearing. He denied that Smith ever asked for his help prior to either trial or that there was a deal for Smith's testimony. Evid. Hr'g Tr., vol. IV at 617-20, 627, 637. Miller stated that Smith initially did not want help because he did not want to be labeled a snitch. *Id.* at 614-15. Miller explained that his contact with the parole board after Mr. Douglas's trial was motivated by Miller's respect for Smith's willingness to testify, not by a deal, and that Smith was unaware of Miller's letter. *Douglas IV* at 10. Miller also opined that such assistance did not trigger his duty as a prosecutor to disclose exculpatory or impeaching evidence. *Id.* at 11.

On January 31, 2006, the district court announced its decision with respect to Mr. Douglas. It found that the testimony at the evidentiary hearing of both Smith and Miller was not credible. It stated that no other evidence had been submitted "to contradict . . . Smith's testimony in [Mr. Douglas's] trial denying the existence of any deals." *Id.* at 18. Thus, the court held that Mr. Douglas had not "presented sufficient facts to raise a serious question about the use and suppression of false evidence by the State or regarding the existence of a deal [prior to Mr. Douglas's trial] in exchange for . . . Smith's . . . testimony." *Id.* at 18, 21. Under the facts presented, the court held that there was "no reasonable

-24-

probability of a different result, and that [Mr. Douglas's] trial resulted in a verdict worthy of confidence." *Id.* at 21. The court therefore denied Mr. Douglas's petition on the merits. The court later granted a COA on the grounds raised in Mr. Douglas's petition.

The district court reached a different conclusion as to Mr. Powell. It found that the testimony at the evidentiary hearing of both Smith and Miller was "highly suspect." *Powell III* at 20. Despite Smith's repeated changes in testimony, the court determined that a "[r]eview of the facts convinces the Court that Derrick Smith's testimony at [Mr. Powell's] trial regarding no help or assistance with his ten-year sentence was false." *Id.* at 20. The court found that Miller's failure to correct these statements, his emphasis of the point in his own closing argument, and his failure to turn over to the defense his letter to the parole board and Smith's letter to his mother all constituted violations of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). Concluding that these violations rendered Mr. Powell's verdict unworthy of confidence, the court conditionally granted his petition. It dismissed as moot, without prejudice, Mr. Powell's other claims. The district court granted a COA permitting Mr. Powell to appeal the conditional nature of the writ granted him.

## The Appeals

In Part II of this opinion, we address in general the applicable standards of review governing the various claims raised in these appeals. In Part III, we

discuss Mr. Powell's *Brady* and *Giglio* claims and Mr. Powell's cross-appeal. We affirm the district court's order granting a conditional writ of habeas corpus to Mr. Powell. In Part IV, we address Mr. Douglas's petitions, which present a more complicated procedural challenge. We are persuaded that the unique circumstances of this case warrant treating Mr. Douglas's *Brady* and *Giglio* claims as part of his initial habeas petition, specifically as a supplement to his prosecutorial misconduct claim involving vouching for the credibility of the eyewitness, Derrick Smith. On that basis, we reverse the district court's denial of his habeas petitions.[10]

II

Standards of Review

The petitions here were filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Thus, our review of the claims in this appeal are governed by AEDPA's standards to the extent that the claims were adjudicated on the merits by an Oklahoma state court. *See Williams v. Taylor*, 529 U.S. 420, 429 (2000). We may grant habeas relief on such claims only if the state court's decision "was contrary to, or involved an unreasonable

---

[10]Because we reverse Mr. Douglas's convictions on this basis, we need not reach the other issues he raises as to the constitutionality of his trial and his sentence.

application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). We presume that the state court's findings of fact are correct unless rebutted by the petitioner by clear and convincing evidence. *See* § 2254(e)(1). We review de novo a district court's legal analysis of the state court's merits decision. *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006).

> A state court decision
>
> is contrary to clearly established federal law under section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."

*Mitchell v. Gibson*, 262 F.3d 1036, 1045 (10th Cir. 2001) (quoting *Williams*, 529 at 412-13). "It is not enough that the state court decided an issue contrary to a lower federal court's conception of how the rule should be applied; the state court decision must be 'diametrically different' and 'mutually opposed' to the Supreme Court decision itself." *Bland*, 459 F.3d at 1009 (quoting *Williams*, 529 U.S. at 406).

> A state court decision is an unreasonable application of federal law under section 2254(d)(2) "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. The reasonableness of the state

-27-

court's application of federal law is to be evaluated by an objective standard. *See id.* at 409-10. The Supreme Court has cautioned "that an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law." *Id.* at 412 (emphasis in original).

*Mitchell*, 262 F.3d at 1045.

The deferential AEDPA standards of review do not apply "if the state court employed the wrong legal standard in deciding the merits of the federal issue." *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003). In addition, the § 2254(d) standards "do[] not apply to issues not decided on the merits by the state court." *Bland,* 459 F.3d at 1010. For claims that the state court did not address on the merits, we review legal conclusions of the district court de novo. *Id.* If the district court held an evidentiary hearing pursuant to 28 U.S.C. § 2254(e), as here, we review its factual findings for clear error; if it "based its factual findings entirely on the state court record, we review that record independently." *Id.* As we discuss further *infra*, when a state court applies plain error review in disposing of a federal claim, the decision is on the merits to the extent that the state court finds the claim lacks merit under federal law. *Cargle*, 317 F.3d at 1206. Where a state court denies relief "for what it recognizes or assumes to be federal error, because of the petitioner's failure to satisfy some independent state law predicate," the decision is not on the merits and, assuming an excuse to procedural bar, "the federal court would be left to resolve the substantive claim de novo, unconstrained by § 2254(d)." *Id.*

Even where we determine an error occurred that might establish relief under these standards of review, "[u]nless the error is a structural defect in the trial that defies harmless-error analysis, we must apply the harmless-error standard" enunciated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), which holds that "habeas relief is proper only if the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Bland*, 459 F.3d at 1009 (quoting *Brecht*, 507 U.S. at 623). A "substantial and injurious effect" exists when the court holds at least a "grave doubt" about the effect of the error on the jury's verdict. *See O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). Grave doubt exists when, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.* at 435.[11]

Because procedural posture determines our standard of review under AEDPA, which, in turn, is often determinative in habeas cases like this one, a brief recap of the current posture of Mr. Powell's and Mr. Douglas's claims is appropriate. Our review of Mr. Douglas's initial habeas claims are governed by the standards set forth previously. Review of both petitioners' *Brady* claims is more complicated. Neither Mr. Powell nor Mr. Douglas raised a *Brady* claim in either of their direct appeals or in their initial applications for state postconviction

_____

[11]As we note *infra* at page 33, note 12, the *Brecht* standard is met when a petitioner establishes the *Brady* prejudice standard. *See Mitchell v. Gibson*, 262 F.3d 1036, 1062 n.13 (10th Cir. 2001).

collateral review. The facts underlying the claims came to light before Mr. Powell filed his federal habeas petition, but only after the district court entered its decision on Mr. Douglas's federal habeas petition and his appeal was pending before us. Although Mr. Powell was able to include the *Brady* claim in his habeas petition, it was necessary for Mr. Douglas to request permission from us to file an additional petition to include his similar *Brady* claim because the claim was unavailable to him earlier through no fault of his own, as we discuss *infra*. As we also discuss *infra*, we have concluded that because of the unique circumstances of this case, Mr. Douglas's *Brady* claim is more appropriately characterized as a supplement to his initial claims of prosecutorial misconduct, and we address it accordingly.

With respect to the *Brady* claims, the district court stayed its proceedings on the respective pending petitions to permit Mr. Douglas and Mr. Powell to file second applications for state postconviction collateral relief to exhaust their claims. The OCCA denied both applications on strictly procedural grounds, holding that the claims were barred by Rule 9.7(G)(3), *Rules of the Court of Criminal Appeals*, 22 OKLA. STAT. Ch. 18, app. (2003), which requires successive postconviction petitions to be filed "sixty (60) days from the date the previously unavailable legal or factual basis serving as the basis of the claim for the new issue is . . . discovered." The district court determined that the State's procedural bar was inadequate to prevent its review because the bar had not been

-30-

evenhandedly applied to similar claims. *Douglas IV*, Dkt. No. 86, filed October 4, 2004. The court subsequently held a joint evidentiary hearing on both Mr. Powell's and Mr. Douglas's similar *Brady* claims. As noted above, it denied relief to Mr. Douglas and conditionally granted relief to Mr. Powell.

The State does not include in its appeal of the district court's grant of the writ to Mr. Powell, nor in its response to Mr. Douglas's appeal, any argument that the district court erred in finding the state procedural bar inadequate or in granting the evidentiary hearing. Accordingly, given that the state court never addressed the *Brady* claims on the merits, we owe it no AEDPA deference. Because the district court held an evidentiary hearing, we review the district court's legal conclusions on the *Brady* claims de novo and its factual findings for clear error. *See Bland*, 459 F.3d at 1010.

When we are not bound by AEDPA deference, we review de novo the existence of a *Brady* violation. *Foster v. Ward*, 182 F.3d 1177, 1192 (10th Cir. 1999). The subsidiary question of whether suppressed evidence is material is a mixed question of law and fact which we also review de novo. *United States v. Trujillo*, 136 F.3d 1388, 1393 (10th Cir. 1998). We review for clear error the district court's factual finding that Smith's testimony at Mr. Powell's trial regarding the lack of a deal with the prosecutor was false. *See Romano v. Gibson*, 239 F.3d 1156, 1175 (10th Cir. 2001). We review de novo the court's determination that Mr. Douglas's evidence was insufficient to support the same

-31-

conclusion. *See United States v. Chavis,* 461 F.3d 1201, 1207 (10th Cir. 2006) ("Sufficiency of the evidence is a question of law that we review de novo. . . .").

Applying these standards, we turn to an assessment of the claims raised in these two appeals. Because of their different procedural postures, we treat Mr. Powell's appeal separately from Mr. Douglas's appeal.

### III

### *Mr. Powell's Napue/Brady/Giglio* **Violations**

Beginning with its seminal decisions in *Napue v. Illinois*, 360 U.S. 264 (1959), and *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court established the principle that criminal convictions obtained by presentation of known false evidence or by suppression of exculpatory or impeaching evidence violates the due process guarantees of the Fourteenth Amendment. "[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972) (internal quotations omitted). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue*, 360 U.S. at 269. The government's obligation to disclose exculpatory evidence does not turn on an accused's request. *Strickler v. Greene*, 527 U.S. 263, 280 (1999). "In order to comply with *Brady*, . . . the individual prosecution has a duty to learn of any favorable evidence known to the

others acting on the government's behalf." *Id.* at 281 (quotation marks omitted).

Under this framework, no distinction is recognized between evidence that

exculpates a defendant and "evidence that the defense might have used to

impeach the [State's] witnesses by showing bias and interest." *United States v.*

*Bagley*, 473 U.S. 667, 676 (1985). We emphasize that the duty to disclose such

information continues throughout the judicial process. *Smith v. Roberts*, 115 F.3d

818, 820 (10th Cir. 1997).

A *Brady* violation has three essential elements: "[t]he evidence at issue

must be favorable to the accused, either because it is exculpatory, or because it is

impeaching; that evidence must have been suppressed by the State, either

willfully or inadvertently; and prejudice must have ensued." *Banks v. Dretke*, 540

U.S. 668, 691 (2004) (quoting *Strickler*, 527 U.S. at 281-82 (1999)). Prejudice

satisfying the third element exists "when the suppressed evidence is material for

*Brady* purposes." *Id*. (internal quotations omitted). Favorable evidence "is

material . . . 'if there is a reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different.'"

*Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *Bagley*, 473 U.S. at 682).[12]

---

[12]The Supreme Court previously articulated a separate materiality standard applicable to *Giglio* violations in *United States v. Agurs*, 427 U.S. 97, 103 (1976), where it held that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."

(continued...)

As the Court has noted, this is not a requirement that the evidence be sufficiently strong to *ensure* an acquittal had it been presented at trial:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Id*. at 434 (quoting *Bagley*, 473 U.S. at 678). Nor is the materiality requirement a sufficiency of the evidence test:

> A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. . . . One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Id*. at 434-35. The petitioner "bears the burden of presenting evidence to establish a *Brady* or *Giglio* violation." *Foster*, 182 F.3d at 1191. However, once *Brady* error is established under the *Kyles* materiality standard, "there is no need for further harmless-error review." *Kyles*, 514 U.S. at 435. This is because a

_____

[12](...continued)
As we subsequently noted, however, assuming the *Giglio* 'reasonable likelihood' standard is in fact less demanding than the *Kyles* 'reasonable probability' standard, a petitioner who succeeds under that standard will still have to meet the harmless error standard of *Brecht v. Abrahamson*, 507 U.S. 619 (1993), which the Supreme Court has held is met by the *Kyles* test. *See Kyles*, 514 U.S. at 435-36. Thus for all practical purposes the two standards ultimately mandate the same inquiry. *Mitchell v. Gibson,* 262 F.3d 1036, 1062 n.13 (10th Cir. 2001).

reasonable probability of a different result in the proceeding "necessarily entails the conclusion that the suppression must have had 'substantial and injurious effect or influence in determining the jury's verdict.'" *Id*. (quoting *Brecht*, 507 U.S. at 623).

On appeal, the State contends the district court erred in granting habeas relief to Mr. Powell on the *Brady* claims[13] because it failed to give proper consideration to the evidence in calculating whether the suppressed and false evidence was material. Mr. Powell cross appeals, contending the district court erred in refusing to grant his writ unconditionally.

**A. Merits**

At Mr. Powell's trial, Derrick Smith's testimony played the indispensable role of identifying Mr. Douglas and Mr. Powell as the gunmen, thereby providing the only direct evidence linking them to the murder of Shauna Farrow and the shooting of Smith. Having reviewed the entire state trial record, we agree with the district court's characterization of Smith's testimony as "the linchpin to a conviction." *Powell III* at 23. Had the jury discounted Smith's testimony as not credible, it almost certainly would not have had sufficient evidence on which to

---

[13]Although we recognize each claim is distinct, for ease of reference we hereinafter sometimes refer generally to the combined *Napue*/*Brady*/*Giglio* claims simply as *Brady* claims or *Brady* violations.

convict. Smith's credibility, and Mr. Powell's inability to impeach him by presenting evidence of his expectation of a benefit in exchange for his testimony, thus played a critical role in determining the verdict. As the Supreme Court stated in originating the *Brady* line of cases, "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue*, 360 U.S. at 269.

The standard of materiality for *Brady* claims such as those presented here "is met when 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Banks*, 540 U.S. at 698 (quoting *Kyles*, 514 U.S. at 435). "In short, [the petitioner] must show a 'reasonable probability of a different result.'" *Id.* (quoting *Kyles*, 514 U.S. at 434). We have discarded as immaterial under this standard undisclosed impeachment evidence where it was cumulative of evidence of bias or partiality already presented "and thus would have provided only marginal additional support for [the] defense." *Trujillo*, 136 F.3d at 1394. In contrast, we have upheld the materiality of nonduplicative impeachment evidence where the witness provided the sole evidence linking the petitioner to the crime. *See Nuckols v. Gibson*, 233 F.3d 1261, 1266 (10th Cir. 2000). Read together, these cases support the principle that evidence insignificantly impacting the degree of impeachment

may not be sufficient to meet the *Kyles* materiality standard, while evidence significantly enhancing the quality of the impeachment evidence usually will. The evidence suppressed here falls into the latter category.

In *Nuckols*, the admissibility of the only evidence linking the petitioner to the crime hinged on the testimony of a single witness, the deputy sheriff, Ware, to whom Nuckols confessed after initially invoking his *Miranda* rights. *Id.* at 1263-64.

> [I]t was critical for the State to establish the admissibility of that confession, but its admissibility hinged upon proof that Mr. Nuckols initiated the interview which produced the incriminating statements. . . . The only witnesses on this critical point were Ware and [Nuckols], each of whom negated the other's testimony. If Ware's testimony that Mr. Nuckols initiated the interrogation were impeached, the entire support for the State's case would have been significantly undermined, if not destroyed altogether.

*Id.* at 1266. The State failed to disclose facts about Ware which would have "provided the defense with the opportunity to call into question whether Ware had a motive for his testimony" or "whether Ware had a motive to goad Nuckols into waiving his right to counsel during the interrogation and confessing to the crime." *Id.* at 1267. Although we did no more than suggest the possibility for the sake of argument that Ware had ulterior motives, we still concluded that the denied opportunity to cross-examine him on these points due to the State's suppression of evidence raised a reasonable probability of a different result sufficient to undermine confidence in the verdict. *Id.*

The parallel between *Nuckols* and the Powell trial is clear. Like Ware, Smith was an indispensable witness for the State's case against Mr. Powell. And although Mr. Powell's counsel attempted to impeach Smith on the issue of his motive to testify, he was stonewalled by Smith's repeated denials of the existence of a deal, and stymied from rebutting those denials by the State's failure to produce relevant impeaching evidence. This combination was as effective at deflecting counsel's attempts at impeachment as was the court order in *Nuckols* excluding counsel's attempts to raise Ware's motives. *Id.* at 1265. Given the paramount importance of Smith to the State's case, we agree with the district court's conclusion that there is a reasonable probability the result of Mr. Powell's trial would have been different if the defense had had the ability to impeach Smith with evidence of the deal the prosecution made in exchange for his testimony.

Relying on *Mataya v. Kingston*, 371 F.3d 353 (7th Cir. 2004), the State contends Smith's earliest identification of Mr. Douglas and Mr. Powell as the gunmen was somehow "self-validating." But the facts in *Mataya* are not comparable to this case. There the witness, whose deal with the prosecution was not disclosed, revealed details about the crime that he could not have known unless they had been revealed to him by the murderer. *Id.* at 357. Hence, his testimony that Mataya had confessed to him was validated by the details he knew. Here, Smith's identification of Mr. Powell as the shooter was not verifiable in the

same fashion.  The more accurate characterization of Smith's statement is that it was somewhat *corroborated*, not that it was *self-validating*.  That one of Smith's several contradictory post-shooting statements was corroborated by other evidence is not an especially strong argument on this record, where Smith was the only eyewitness to the shooting and there was no other direct evidence connecting Mr. Powell to the crime.  As in *Nuckols*, 233 F.3d at 1267, the State offers contentions that should have been resolved by a jury but were not because the prosecution withheld or concealed crucial impeachment evidence.

Because impeachment of the witness who held the key to the successful prosecution of Mr. Powell was denied to the defense, the district court correctly concluded that the State's *Brady* violations were material.  In so deciding, the court found that, "at a minimum, Mr. Smith used his identification testimony in an effort to benefit himself, Mr. Miller was aware of Mr. Smith's requests for assistance, had acted on his request, and that this information was not known by or conveyed to [Mr. Powell's] trial counsel." *Powell III* at 21-22.  Under these facts and in light of the necessity of the jury believing Smith's testimony to support a verdict of guilty, we agree with the district court that Mr. Powell's trial did not yield a verdict worthy of confidence.  Accordingly, the district court correctly granted Mr. Powell's petition for a writ of habeas corpus.


**B. Conditional Writ**

In his cross-appeal, Mr. Powell contends the district court should have granted the writ with an unconditional directive releasing him from prison and barring a retrial. We review the district court's formulation of an appropriate habeas corpus remedy for abuse of discretion. *See Paxton v. Ward*, 199 F.3d 1197, 1219 (10th Cir. 1999).

A federal writ of habeas corpus "does not generally bar a retrial of the petitioner on the charges underlying his defective conviction." *Capps v. Sullivan*, 13 F.3d 350, 352 (10th Cir. 1993). "In fact, rather than barring a new trial, the district court normally should facilitate it by suspending the writ for a time reasonably calculated to provide the state an adequate opportunity to conduct the new trial." *Id.* Nevertheless, "[i]n issuing a writ of habeas corpus, a federal court has the power and authority to dispose of habeas corpus matters as law and justice require." *Paxton*, 199 F.3d at 1219 (internal quotation and citation omitted). The statutory basis for the federal courts' authority to render habeas corpus relief, 28 U.S.C. § 2243, "vests the federal courts with 'the largest power to control and direct the form of judgment to be entered in cases brought . . . on habeas corpus.'" *Capps*, 13 F.3d at 352 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987)) (alteration in original). Barring a new trial may be necessary, for instance, "when the error forming the basis for the relief cannot be corrected in further proceedings," and it may be a permissible form of relief when "other exceptional circumstances exist such that the holding of a new trial would be

unjust." *Id.* at 352, 353. The classic example of such an irremediable error, necessitating the grant of an unconditional writ, is "when a [new] trial would violate the Double Jeopardy Clause of the Fifth Amendment." *Id.* at 352. But where nothing in the record suggests that the constitutional violation on which habeas corpus relief is predicated could not be redressed by holding a retrial, granting an unconditional writ constitutes an abuse of discretion. *See id.* at 353.

Nothing in the record of Mr. Powell's trial indicates irremediable error, and he suggests none, arguing only that the duration of the State's continuing *Brady* violations rises to the level of extraordinary circumstances justifying an unconditional writ. Without speculating as to whether granting an unconditional writ would be an abuse of discretion under these circumstances, it is plain that granting a conditional writ is not.

## IV

## Mr. Douglas's Due Process Claims

Mr. Doulgas contends we should overturn his convictions because the prosecutor violated his due process right to a fair trial by vouching for the credibility of Smith, the lynchpin witness, by knowingly eliciting false testimony from Smith to bolster his credibility, by failing to correct testimony he knew to be false, and by failing to disclose that Smith was testifying against Mr. Douglas pursuant to an agreement by the prosecutor to assist Smith in extracting him from

-41-

numerous ongoing and potential legal difficulties.  In addressing these arguments,
we also determine the standard of review applicable to each.

## A.  Prosecutorial Misconduct

"Inappropriate prosecutorial comments, standing alone, would not justify a
reviewing court to reverse a criminal conviction obtained in an otherwise fair
proceeding."  *United States v. Young*, 470 U.S. 1, 11 (1985).  But habeas relief is
appropriate when a prosecutor's comments "so infected the trial with unfairness
as to make the resulting conviction a denial of due process."  *Donnelly v.
DeChristoforo*, 416 U.S. 637, 643 (1974).  If an improper comment implicates
"specific guarantees of the Bill of Rights," federal courts "ha[ve] taken special
care to assure that prosecutorial conduct in no way impermissibly infringes
them."  *Id.*

When analyzing prosecutorial misconduct claims, we have rejected prior
invitations "to parse the prosecutor's argument word by word in a vacuum."
*Paxton,* 199 F.3d at 1217.  Rather, we have stated that

> [i]nquiry into fundamental fairness requires *examination of the entire
> proceedings*, including the strength of the evidence against the
> petitioner, both as to guilt at that stage of the trial and as to moral
> culpability at the sentencing phase.  Any cautionary steps — such as
> instructions to the jury — offered by the court to counteract improper
> remarks may also be considered.  Counsel's failure to object to the
> comments, while not dispositive, is also relevant to a fundamental
> fairness assessment.

*Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002) (citations omitted & emphasis added). "Ultimately, we must consider the probable effect the prosecutor's statements would have on the jury's ability to judge the evidence fairly." *Tillman*, 215 F.3d at 1129 (quoting *Moore v. Reynolds*, 153 F.3d 1086, 1113 (10th Cir. 1998)) (alteration omitted). In making that assessment, we must consider whether "the prosecutor's argument . . . manipulate[d] or misstate[d] the evidence, "whether it impacte[d] other specific rights of the accused such as the right to counsel or the right to remain silent," whether "the objectionable content was invited by or responsive to the opening summation of the defense," and whether "[t]he weight of the evidence against petitioner was heavy." *Darden v. Wainright*, 477 U.S. 168, 181-82 (1986).

### 1. *Oklahoma's Plain Error Review*

Of the guilt phase comments we address here, none were addressed expressly on the merits by the OCCA. Those raised in Mr. Douglas's first request for post-conviction relief were summarily dismissed under the OCCA's plain error doctrine. *See Douglas I*, 951 P.2d at 674 ("[W]e have reviewed the remaining comments not properly preserved and find no plain error.").

In *Cargle*, we explained "the effect of state plain-error review on procedural bar and § 2254(d) deference principles":

> As for procedural bar, the question is: does a state court's plain-error review of an issue otherwise waived for lack of a trial objection constitute a merits decision under *Harris v. Reed*, 489 U.S. 255

(1989), thus negating application of procedural bar, or does OCCA's use of the heightened standard of plain error constitute the enforcement of a state waiver rule under *Harris*, thus necessitating application of procedural bar? . . . As for § 2254(d), the question is: does a state court's use of a plain-error standard affect the deference that the federal court owes to the state court's determination? . . .

In our view, the answer to both questions depends on the substance of the plain-error disposition. A state court may deny relief for a federal claim on plain-error review because it finds the claim lacks merit under federal law. In such a case, there is no independent state ground of decision and, thus, no basis for procedural bar. Consistent with that conclusion, the state court's disposition would be entitled to § 2254(d) deference because it was a form of merits review. On the other hand, a state court could deny relief for what it recognizes or assumes to be federal error, because of the petitioner's failure to satisfy some independent state law predicate. In such a case, that non-merits predicate would constitute an independent state ground for decision which would warrant application of procedural-bar principles on federal habeas. If the state procedural bar were then excused for some reason, the federal court would be left to resolve the substantive claim de novo, unconstrained by § 2254(d).

317 F.3d at 1205-06 (citation omitted).

In certain cases, however, we may not be able to assess the substance of the state court's plain error disposition to determine whether it was merits or non-merits based. In this case, for instance, the state court's opinion merely states that it "reviewed" Mr. Douglas's prosecutorial misconduct claims that were not properly preserved and found no plain error. *Douglas I*, 951 P.2d at 674. We thus have no way to determine whether the court's review was or was not merits based. In situations like this one, our cases require us to assume that the state's review is on the merits and thus afford it § 2254(d) deference. *See Hawkins v.*

-44-

*Mullin*, 291 F.3d 658 (10th Cir. 2002); *Aycox v. Lytle*, 196 F.3d 1174 (10th Cir. 1999). In *Aycox*, for example, a New Mexico state court "denied [the petitioner's] state habeas petition in a summary order of dismissal which simply provided that 'as a matter of law, Petitioner is not entitled to relief.'" *Aycox*, 196 F.3d at 1177 (citation omitted). Where there was "no evidence . . . that the state court did not consider and reach the merits of [the petitioner's] claim," we held that "we owe[d] deference to the state court's *result* even if its reasoning [was] not expressly stated." *Id.* Consequently, we are required to uphold the state court's decision, "unless our independent review of the record and pertinent federal law persuades us that its result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Id.* at 1178.

Similarly, in *Hawkins*, the petitioner asserted "that three categories of improper comments made by prosecutors violated the Eighth and Fourteenth Amendments." *Hawkins*, 291 F.3d at 674. But the Oklahoma Court of Criminal appeals had "specifically addressed only some of these challenged remarks." *Id*. "Nonetheless," we observed, "we still afford deference to that court's decision denying relief on these claims, even though the state appellate court did not specify the reasons underlying its decision." *Id*. We then applied the AEDPA deference standard to the OCCA's determination that the petitioner did not meet Oklahoma's plain error standard. *Id.*

-45-

We further refined our AEDPA review of the OCCA's plain error review in *Thornburg v. Mullin*, 422 F.3d 1113 (10th Cir. 2005). In that case, the petitioner asserted several instances of prosecutorial misconduct and alleged that together they deprived him of due process under the *Donnelly* standard. "Without enumerating each specifically contested comment," the OCCA concluded generally that the comments complained of "were not so egregious as to rise to the level of plain error." *Id.* at 1129 (quotations and citation omitted). We said that "[b]ecause the OCCA did not identify the comments it thought improper, we conduct our own independent review of the record and federal law." *Id.* Although we recognized a number of improper prosecutorial comments, we then afforded "due deference to the OCCA under AEDPA," *id.* at 1138, and concluded that "[i]n light of the strength of the evidence of guilt, the OCCA could reasonably conclude that the prosecutor's misconduct did not necessitate a new trial." *Id.*

Applying these principles, we assume the OCCA addressed Mr. Douglas's individual prosecutorial misconduct claims on the merits, we review each assertion of improper prosecutorial comments independently under federal law, and we afford § 2254(d) deference to the OCCA's ultimate conclusion that a new trial was not warranted on the basis of prosecutorial misconduct.

## 2. *Vouching for Derrick Smith's Credibility*

In his initial habeas petition, Mr. Douglas asserted that Miller improperly vouched for Smith's credibility in several comments Miller made during his closing argument. The district court concluded, and the State contends on appeal, that the statements were permissible commentary on Smith's credibility, rather than an improper expression of prosecutorial opinion. Viewed in the context of this trial and the remainder of Miller's closing argument, we disagree.

Under *Young*, vouching for the credibility of witnesses is equally as improper as other methods of "offering unsolicited personal views on the evidence." *See* 470 U.S. at 7-8 (noting further that ABA Standards hold "[i]t is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony"). "It is clearly impermissible to bolster a State witness by suggesting that information available to the prosecution but not presented to the jury supports a witness's testimony." *Cargle*, 317 F.3d at 1219.

The theme of Smith's credibility ran throughout Miller's closing argument, and the challenged remarks by Miller spanned some six pages of the trial transcript. The following passage is particularly illustrative of the unacceptable remarks:

> Derrick Smith's life will never be the same, whether that's good or bad, not even remotely the same. He will never be safe again. He knows it. He's going to have to leave the State of

Oklahoma.  He cannot function in this world any more in Oklahoma City, which may be the best thing for him.  But all that's because he followed the law, and he *did what he was supposed to do, and he came into this courtroom.*

Was he partial?  Folks, remember this.  Every time that Mr. Kirk's investigator, every time Peanut, every time anybody wanted to talk to Derrick Smith, he didn't say, no, Brad's got to be here.  He didn't say, no, I'm not talking to you, you hear me in court.  He talked to them.  He read their notes.  He listened to their little tapes.  He talked to them *because he's got nothing to hide.  We have nothing to hide because it's the truth.*

Was he motivated to lie?  Was he motivated to lie?  I suggest to you that everything about his background, all the people he knew, every life experience that he's ever had motivated him to lie.  He was motivated to lie.

*He was motivated to tell the police that he didn't see who did it, handle the perpetrators on the street on his own, tell the D.A. they had masks on and he couldn't see their faces.*  He could have done all those things and uphold his gang identity.  He could still be — he could be a hero on the street in the gang culture, if he wanted to be.

And he even did that for a while.  For the first 15 hours he did conceal things from police officers.  For 15 hours before he finally talked with his mother and Dave Dycus, he did in fact conceal and try to divert and try to decide.  He was confused, should he handle this on his own.  There's no question about that.

. . . .

*It's a defining moment in his young life, and he made a decision to tell it.  And ever since that 15th hour that he finally told* straight up what Dave Dycus who was paid to ferret out *the truth —* wonderful statement, the quote of the case.  People lie to me every day.  That's what Dave Dycus said.

There's a job for you.  People lie to him every day.  And they pay him to try to get to the truth, and sometimes, as he told you, he can.  *And after he talked to Derrick in the pen, he told exactly what he's told at prelim, exactly what he's told us in this courtroom.  He told what Dave Dycus believed was straight up the truth.  And it's never changed since.*

Douglas Trial Tr., vol. IX at 1876-78 (emphasis added).  Unlike the district court,

we read this as a clear expression of Miller's opinion that Smith is telling the

truth, going well beyond commentary that Smith should be believed by the jury. In so doing, Miller raised the implication that his belief in the truthfulness of Smith's testimony is rooted in his knowledge of facts outside the evidence already presented. Miller's comments constitute error.[14] This is particularly so given what surfaced later, that the prosecutor had made an offer to assist Smith with his numerous legal difficulties in exchange for his favorable testimony and had then suborned perjury by having Smith repeatedly deny the existence of a deal, matters to which we now turn.[15]

## B. Mr. Douglas's *Brady/Napue/Giglio* Claims

In Mr. Douglas's trial, as in Mr. Powell's trial, Smith's eyewitness testimony played the indispensable role of identifying Mr. Douglas and Mr. Powell as the gunmen, thereby providing the only direct evidence linking them to

---

[14]Added to this, the OCCA found error in the prosecution's bolstering of Smith's credibility by erroneously arguing that Mr. Douglas attempted to intimidate Smith as a witness before he testified. *Douglas I*, 951 P.2d at 669.

[15]AEDPA deference prevents us from saying that, standing alone, Miller's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. As we previously discussed, although the OCCA summarily dismissed this claim under its plain error doctrine, we afford § 2254(d) deference because our case law requires us to assume the OCCA addressed the claims on the merits. *Hawkins, 291 F.3d at 674; Aycox*, 196 F.3d at 1177. The OCCA's refusal to overturn the conviction on the basis of Miller's comments was not an unreasonable application of Supreme Court law. However, as we determined above, because the OCCA never addressed the *Brady* claim at all, we may review that claim de novo.

-49-

the murder of Shauna Farrow. Smith's testimony was therefore key to the convictions of Mr. Douglas. Mr. Douglas contends the district court erred in holding there was insufficient evidence offered at the evidentiary hearing that Brad Miller made a deal with Smith to help him with his pending criminal matters in exchange for his favorable testimony, and then not only failed to disclose that agreement to the defense in violation of *Brady* but also solicited from Smith false denials of any deal in violation of *Napue* and failed to correct assertions by Smith he knew to be false in violation of *Giglio*, thereby giving the jury a false impression of Smith's credibility. The State contends that these claims are barred by the one-year statute of limitations period set forth in AEDPA, 28 U.S.C. § 2244(d)(1), that they are also barred under 28 U.S.C. § 2244(b)(2) because Mr. Douglas has not met the standards for bringing a second or successive habeas petition, and that, in any event, the district court was correct to hold Mr. Douglas failed to present sufficient evidence of the validity of the claims.

### 1. *Statute of Limitations*

Section 2244(d)(1) requires that petitioners file their application for a writ of habeas corpus within a one-year period of limitation which runs from the latest of four critical dates, only one of which is relevant here: "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." In support of its contention that Mr. Douglas could have discovered the factual basis for the instant *Brady* claims

-50-

within the statutory period, the State cites only Smith's testimony from the federal evidentiary hearing that his conscience had been bothering him and that "[t]his was not a new development." Douglas Aple. Response Br. 19 (citing Evid. Hr'g Tr., vol. I at 14, 17).

The State's argument that Mr. Douglas could have, through the exercise of greater diligence, uncovered the existence of a deal for Smith's testimony fails to take into account the evidence that Miller continued to entice Smith's silence by helping him even after Miller left the district attorney's office. Moreover, other agents of the State prevented the facts underlying the claim from becoming known when they failed to turn over to Mr. Douglas or Mr. Powell additional undisclosed evidence of the alleged deal uncovered by the OSBI investigation, despite the ongoing federal habeas proceedings.

The diligence question here is not unlike that present in the Supreme Court's decision in *Banks*, 540 U.S. 668. As in *Banks*, a prosecution witness here "repeatedly misrepresented his dealings with [the prosecution]; each time [the witness] responded untruthfully, the prosecution allowed his testimony to stand uncorrected." *Id*. at 694. It was "appropriate for [Mr. Douglas] to assume that his prosecutors would not stoop to improper litigation conduct to advance prospects for gaining a conviction," and he can thereby show cause for any alleged failure to exercise due diligence in investigating Smith's connections to Miller. *Id.* And, as in *Banks*, "[t]he state here nevertheless urges, in effect, that

-51-

the prosecution can lie and conceal and the prisoner still has the burden to . . . discover the evidence, so long as the 'potential existence' of a prosecutorial misconduct claim might have been detected." *Id.* at 696 (alteration in original). Not surprisingly, the Court in *Banks* rejected this claim, holding that "[w]hen police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight." *Id*. at 675-76.

In light of the district court's conclusion that Miller was an active participant in shielding any evidence of the facts underlying the instant claim from both Mr. Powell and Mr. Douglas, we are not persuaded by the State's contention that Mr. Douglas could have uncovered the illicit dealings between Miller and Smith prior to Smith's recantation. Therefore, we conclude Mr. Douglas, exercising due diligence, could not have discovered this *Brady* claim any sooner.

### *2. § 2244(b)(2) and the Merits*

Despite its determination that the State unconstitutionally failed to disclose a deal between Miller and Smith with respect to Mr. Powell, the district court held there was insufficient evidence of a similar deal between Smith and Miller before or during Mr. Douglas's trial to support the asserted *Brady* violations. The court noted that "the key question is whether [Mr. Douglas] has demonstrated that the trial testimony of Derrick Smith was false." *Douglas IV* at 17. In assessing

this question, the court found the "veracity of each of the primary witnesses [Smith and Miller] who testified [at the evidentiary hearing] to be highly suspect." *See id.* at 18. This toss-up about who was telling the truth led the court to evaluate only the sufficiency of the non-testimonial evidence supporting Mr. Douglas's claim of a deal between Smith and Miller. After reviewing that evidence, the court held "[t]he evidence presented at the evidentiary hearing is insufficient to support [Mr. Douglas's] claims of a deal in exchange for testimony, or that Derrick Smith's testimony at Mr. Douglas's trial was untruthful." *Id.* at 17. Consequently, the court concluded that "there is no reasonable probability of a different result, and that [Mr. Douglas's] trial resulted in a verdict worthy of confidence." *Id.* at 21.

At the evidentiary hearing, Smith testified he told Miller at their initial meeting he could not identify the gunmen who shot him and Shauna Farrow and, in response, Miller mentioned the trafficking charge then pending against Smith and the crack cocaine he had been carrying at the scene of the shooting. Evid. Hr'g Tr., vol. I at 11-12. When Smith asked Miller what he might get in exchange for testimony identifying Mr. Douglas and Mr. Powell, Smith testified that Miller told him he would get nothing until after the trial in order to avoid raising questions about his credibility before the jury. *Id.* at 36-38. The problem, in the district court's view, was that, setting aside Smith's testimony, the version of events described by Smith was "not supported by any evidence other than

supposition and innuendo extracted from post-trial actions of Brad Miller —

many of which occurred years after [Mr. Douglas's] trial." *Douglas IV* at 17.

With what it considered insufficient evidence, the district court refused to draw

an inference that there was a deal between Smith and Miller in the Douglas trial.

Insufficiency of the evidence is a legal question which we review de novo.

*See, e.g., Chavis*, 461 F.3d at 1207; *see also Griffin v. United States*, 502 U.S. 46,

58-59 (1991) (indicating that insufficiency of proof is legal error). We therefore

must determine whether Mr. Douglas provided sufficient evidence on the record

before us to support his claim.

The evidence establishes the following. The day after the shooting, Smith

made several statements to police investigators that diverged widely from each

other and from the scenario the prosecution sought to prove at trial: the

description of the vehicle, the number of shooters, and the identification of the

assailants. *See supra* at 6-9. In addition, several witnesses testified at Mr.

Douglas's trial that Smith had told them he could not accurately identify the

shooters. *See, e.g,* Douglas Trial Tr., vol. VII at 1442-44 (testimony of Devin

Pope: "[t]here were some guys in [a car Smith] couldn't recognize because it was

dark . . . and he didn't really see nobody."); *id.* at 1474 (testimony of Joanne

Paul: "And I asked [Smith], did he see who shot him, and he said, no, because it

was too dark."); *id.* at 1493 (testimony of Esi McNeil: "I asked him, did he see

who shot him, and he was like, man, I was so high, man, I didn't see nobody.");

*id.* at 1531 (testimony of Craig Laster "I said who was it?  And he was like, man, I was so high and I was so drunk, I didn't know who it was . . . . And I said, are you sure you didn't see nobody?  And he was like, well, I thought I seen Paris, but, you know, it could have been anybody.").  Notably, at Mr. Powell's trial, Smith admitted he had told Joanne Paul that he did not really see either Mr. Douglas or Mr. Powell in the car.  Powell Trial Tr., vol. V at 1172.  This evidence tends to support the likelihood of Miller offering to assist Smith in order to ensure Smith's identification of Mr. Douglas as one of the shooters.

Moreover, two witnesses testified at trial that Smith told them he *had* made a deal for his testimony with Miller.  *See* Douglas Trial Tr., vol. VII at 1495 (testimony of Esi McNeil); *id.* at 1532 (testimony of Craig Laster).  Both witnesses testified that Miller was to assist Smith on his trafficking case and a pending gun case in exchange for testimony favorable to the prosecution.  On cross-examination of the witnesses, Miller noted that Smith's gun case was dismissed before the relevant time period, *id.* at 1514, 1552, but Miller did not mention the trafficking case.

In regard to Miller's assistance to Smith with his pending criminal matters, Smith was charged in 1992 with drug trafficking.  He was sentenced to ten years but released after four months on pre-parole status (PPS).  Three months later, after violating his parole conditions, Smith was reincarcerated.  Shortly before Mr. Douglas's trial, Smith received notification that he would be reviewed for

parole once again. This time he was not recommended for pre-parole release. (Ex. 81.) Three days later, he met with Brad Miller to prepare his trial testimony. At the evidentiary hearing, Miller acknowledged that Smith's pre-parole situation was probably discussed at the pretrial meeting between him and Smith and that information from Smith "possibly" formed the basis of Miller's subsequent post-trial letter to the Pardon and Parole Board. Evid. Hr'g Tr., vol. IV at 693-94. On July 1, 1995, the day after Mr. Douglas was sentenced to death, Miller wrote a letter recommending that Smith receive parole and noting that Smith would "be required to testify in Paris Powell's trial," as well. Evid. Hr'g Ex. 2A. The letter evidenced a fairly detailed understanding of Smith's situation. *See id.*; Evid. Hr'g Tr., vol. IV at 693-94 ("During his incarceration, [Smith] was placed on the PPS program. In October '94 marijuana was detected in his urine sample. As a result, [Smith] was returned to Ardmore CTC. He has lived in that facility doing day work in the community since that time. It is my understanding [Smith] has received no negative write-ups from supervisors.") Smith was released on PPS in October 1995. Additionally, although Miller knew Smith had been carrying both crack cocaine, which he intended to sell, and a loaded firearm at the time he was shot, he was never charged for possession of either of those items. *See* Evid. Hr'g Tr., vol. I at 36-39 (reflecting that Miller knew about these crimes and the absence of charges against Smith); *see also* Douglas Trial Tr., vol. IX at 1870 (prosecuting attorney Miller says Smith admitted the cocaine was his).

-56-

Two years later, and a month before Mr. Powell's trial began, Smith wrote a letter to his mother stating his expectation that he would receive credit against his sentence in exchange for his testimony against Mr. Powell and intimating he had previously received benefits for his testimony against Mr. Douglas. Miller's notes of a telephone call with David Petite confirm he had discussions about crediting days against Smith's sentence. After Mr. Powell's trial, Smith wrote to Warden Boone, inquiring whether Miller had contacted him about the length of Smith's sentence; Warden Boone confirmed he had been contacted by Miller, and Smith was later awarded 400 lost credit days and released. Subsequently, Miller personally dismissed an assault charge against Smith and intervened in a later trafficking case on Smith's behalf. Notwithstanding this evidence, at the evidentiary hearing Miller denied the existence of any deal for Smith's testimony. As the district court held with respect to Mr. Powell, "Miller's statements denying any deal or promises in exchange for . . . Smith's testimony is contradicted by . . . Miller's letter to the parole board, . . . Smith's letter to his mother, and Mr. Miller's conversation with David Petite regarding 'coop credit,' for . . . Smith immediately before trial." *Powell III* at 20. The State does not contest on appeal that these facts establish Smith received a benefit from Miller prior to Mr. Powell's trial and, consequently, that Smith's testimony to the contrary at his trial was known by Miller to be false.

As Mr. Douglas points out, finding the evidence insufficient to demonstrate

a deal prior to Mr. Douglas's trial requires belief in an unlikely scenario.

> [T]o accept the district court's ruling in Mr. Douglas's case virtually
> requires acceptance of two . . . exceedingly improbable premises: 1)
> that Miller suddenly became dishonest between the two trials, and 2)
> that [Smith's] interest in help and Miller's willingness to provide
> help suddenly sprang to life between the two trials.

Aplt's Br. at 38. The fact that Smith met with Pardon and Parole investigators only three days before he met with Miller and then discussed the denial of pre-parole with Miller, as Miller admits, suggests the two men might have arrived at an agreement prior to Mr. Douglas's trial in which Miller would intervene in the parole process in exchange for testimony helpful to the prosecution. Moreover, the level of detail included in the letter Miller wrote on Smith's behalf the day after Mr. Douglas's trial and Miller's compromised credibility at the evidentiary hearing, together with Smith's inconsistent pretrial statements about events the night of the shooting, raises the reasonable inference that Smith and Miller had an agreement prior to Mr. Douglas's trial. When viewed in light of the evidence that surfaced after Mr. Powell's trial regarding Miller's continuing efforts on behalf of Smith during and long after the trials ended, including the district court's findings that Miller committed *Brady* violations in the Powell case, misrepresented facts to the contrary to the capital jury and to the district court, and sponsored false testimony to hide incentives requested by and provided to Smith, we are persuaded that the reasonable inference becomes inescapable.

Our case law provides some support for this conclusion. For example, we

-58-

have previously noted that a record strikingly similar to this one raised significant suspicions about the existence of a deal for the witness's testimony, "particularly in light of the timing of these events and the significant benefit [the witness] derived . . . ." *Romano v. Gibson*, 239 F.3d at 1175 (nevertheless refusing to find deal where, unlike here, district court's determination to contrary was a factual finding and standard of review was therefore clear error). We have also stated that where a witness's trial testimony does not vary from a pretrial statement offered without any inducement by the state, "we have no reason to believe the prosecution needed to make a deal . . . in order to make its case." *Foster*, 182 F.3d at 1192. But where, as here, the indispensable witness's trial testimony varied significantly from his pretrial statements, an inference arises that the prosecution needed a deal to make its case.

In *Cargle v. Mullin,* 317 F.3d 1196, 1214 (10th Cir. 2003), we held that counsel can be constitutionally ineffective for failing to synthesize known facts and assume a quid pro quo existed in similar circumstances. There, a key witness and participant in the murders, Jackson, previously had been given a deferred five-year sentence which would be reinstated if Jackson committed any state law violations. Because Jackson's conduct made him a potential accessory to the murder, he received a tacit assurance from the prosecutor "that nothing would come up in court about the deferred sentence." *Id.* at 1215. Even though an agreement between Jackson and the prosecution purporting to memorialize "the

entire agreement" *id.* at 1214, had been introduced at trial, we held that defense counsel was ineffective for failing to assume the deal with the prosecution also applied to Jackson's deferred sentence and to highlight this point for the jury:

> Counsel knew about Jackson's deferred sentence. Any competent attorney would have discerned the legal connection between Jackson's conduct in this case and the conditions sufficient to trigger acceleration of the deferred sentence. Quite apart from the tacit quid pro quo assurances, Jackson's mere exposure to this punitive threat was pertinent to the jury's assessment of his motivation for testifying. Like a pending criminal charge or possible probation violation, this threat was "relevant to show pro-government bias on the part of the testifying witness, on the theory that the witness might tailor [his] testimony to please the prosecutor." Yet counsel erroneously confessed a pretrial motion in limine preventing the defense "from mentioning, referring to, inferring or in any way informing the jury" about Jackson's deferred sentence.

*Id.* at 1215 (quoting *Stephens v. Hall*, 294 F.3d 210, 224 (1st Cir. 2002)).

Here, the operative facts suggesting an understanding between Smith and Miller prior to Mr. Douglas's trial are at least equally suspicious, and there is no countervailing evidence of a merger clause as in *Cargle*. If counsel are expected, under threat of a *Strickland* claim against their performance, to draw the inference that a deal exists from suspicious or convenient facts, even in the face of an admitted agreement that purports to exclude other deals as in *Cargle*, it seems unreasonable in light of all the evidence here not to draw the inference that a tacit agreement, if not more, existed in this case prior to Smith's testimony at Mr. Douglas's trial.

Four circuits have found a duty to disclose under *Brady* where there was a

tacit agreement promising potential or actual leniency. The Ninth Circuit has held that a tacit agreement between a prosecution witness and a prosecuting attorney constitutes exculpatory material subject to disclosure under *Brady*. *See United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir. 1986) (stating "[w]hile it is clear that an explicit agreement would have to be disclosed because of its effect on [the witness's] credibility, it is equally clear that facts which imply an agreement would also bear on [the witness's] credibility and would have to be disclosed"). In *Shaffer*, the "facts which impl[ied] an agreement" were that the prosecution knew the witness had acquired assets through a drug operation and had decided not to pursue forfeiture proceedings against him. *Id*. The court held that these facts were exculpatory and the prosecution was required to disclose them.

Similarly, in *Wisehart v Davis*, 408 F.3d 321, 323-24 (7th Cir. 2005), the Seventh Circuit recognized "there might have been a tacit understanding that if [the witness's] testimony was helpful to the prosecution, the state would give him a break on some pending criminal charge . . . . Express or tacit, either way there would be an agreement, it would be usable for impeachment, and it would have to be disclosed to the defense."

Even in the absence of any agreement with the prosecution, the Eighth Circuit has held the fact that a sentence commutation hearing was to take place soon after the witness's appearance at a criminal trial constituted exculpatory

material that should have been disclosed under *Brady*. Thus, in *Routter v. Solem*, 888 F.2d 578, 582 (8th Cir. 1989), the court held "[t]he fact that there was no agreement . . . is not determinative of whether the prosecution's actions constituted a *Brady* violation requiring reversal . . . . We hold that, viewed in the context of petitioner's trial, the fact of [the witness'] impending commutation hearing was material . . . and that petitioner therefore is entitled to relief." The court also held it was highly improper for the prosecutor to comment to the jury that the witness had nothing to gain from his testimony. *Id.* The court did not find that the comment alone was enough for a new trial, but determined that it further undermined the court's confidence in the conviction. Notably, Miller made similar comments at Mr. Douglas's trial.

Most recently, in *Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008), the court acknowledged "[t]he existence of a less formal, unwritten or tacit agreement is also subject to *Brady's* disclosure mandate . . . . If [Defendant] could prove that [the witness] and [the prosecutor] had reached a mutual understanding, albeit unspoken, that [the witness] would provide testimony in exchange for the district attorney's intervention in the case against him, such an agreement would qualify as favorable impeachment material under *Brady*." The court in *Bell* declined to infer a tacit deal due to insufficient evidence. *Id*. at 233-234. "[I]t is not the case that, if the government chooses to provide assistance to a witness following a trial, a court must necessarily infer a preexisting deal subject to disclosure under

-62-

*Brady.*" *Id.* at 234; *see also Shabazz v. Artuz*, 336 F.3d 154, 162 (2d Cir. 2003) (favorable treatment for a witness is insufficient to show an agreement between the prosecution and the witness).

Like the majority of our sister circuits, we conclude that *Brady* requires disclosure of tacit agreements between the prosecutor and a witness. A deal is a deal — explicit or tacit. There is no logic that supports distinguishing between the two. The dissent in *Bell* illustrates the importance of disclosing a tacit agreement.

> [The requirement that] prosecutors disclose tacit agreements is undoubtedly the correct result, as the same policies justifying the disclosure of explicit agreements also compel the disclosure of tacit agreements. Like explicit agreements, tacit agreements are likely to be relevant to credibility, and therefore should be disclosed to the jury. Indeed, tacit agreements may be *more* likely to skew the witness's testimony. In the case of an explicit agreement, the testifying witness will know what he can expect to receive in exchange for his testimony, and will know the conditions he must fulfill. When a witness is instead led to believe that favorable testimony will be rewarded in some unspecified way, the witness may justifiably expect that the more valuable his testimony, the more valuable his reward.
>    The threat of incorrect jury verdicts is further increased by tacit agreements because, when testifying, a witness whose agreement is tacit, rather than explicit, can state that he has not received any promises or benefits in exchange for his testimony . . . . Likewise the prosecutor can argue to the jury that the witness is testifying disinterestedly,[16] which artificially increases the witness's credibility-artificially, that is, because the premise of the argument is false.

---

[16]Miller did exactly this. *See* Douglas Trial Tr., vol. IX at 1867-68; 1870-72, 1876-77.

*Bell*, 512 F.3d at 244-45 (Clay, J., dissenting) (internal citations omitted.).

Here, we have much more than merely favorable treatment of Smith immediately after Mr. Douglas's trial. We have a continuing pattern of Miller providing or instigating favorable treatment for Smith for several years, even after Miller left his position with the district attorney's office. We also have Smith testifying that because of the favorable treatment, he lied when he identified Mr. Douglas and Mr. Powell as the perpetrators of the murder, as well as the inference that Smith did not recant his testimony earlier because he was still receiving benefits. Based on our de novo review of the record, we disagree with the district court's conclusion that Mr. Douglas presented insufficient evidence of a tacit agreement between Miller and Smith for Smith's testimony at Mr. Douglas's trial.

We need not rehash the details of whether the deal was material to Mr. Douglas or whether it caused him prejudice. Everything we said in the *Brady* discussion of Mr. Powell's claims applies equally to Mr. Douglas. The evidence was clearly favorable to Mr. Douglas because it was strong impeachment evidence going to the credibility of the key witness. The State not only suppressed the evidence by presenting false, uncorrected testimony denying the existence of any deal between the prosecutor and Smith, it also relied heavily on the lack of any deal in vouching for the credibility of Smith, which we discuss *infra*. The denial of the opportunity to impeach Smith on this evidence clearly prejudiced Mr. Douglas.

When Mr. Douglas first raised his *Brady* claim to this court, while his appeal from the denial of his initial habeas petition was pending here, we treated that claim as a second or successive request for habeas relief. To obtain habeas relief on a second or successive request, Mr. Douglas would have to show both that 1) "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence;" and 2) "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B). With the benefit of the evidentiary hearing and upon further review, however, we conclude that under the unique circumstances of this case as we now know them, it is more appropriate to treat Mr. Douglas's *Brady* claim as a supplement to the prosecutorial misconduct claims he alleged in his initial habeas petition. As such, he need not satisfy 28 U.S.C. § 2244(b)(2)(B)'s requirements for pursuing a second or successive habeas petition before he can obtain habeas relief.[17]

In reaching this conclusion, we note that AEDPA itself "does not define the terms 'second or successive.'" *United States v. Lopez*, 534 F.3d 1027, 1033 (9th

---

[17]It is clear, as previously discussed, *see supra* section IV.B.1, that Mr. Douglas could not, through the use of due diligence, have discovered the factual predicate for his *Brady* claim any earlier.

Cir. 2008), *reh'g granted*, 2008 WL 5000037, at *1 (9th Cir. Oct. 30, 2008); *see also Panetti v. Quarterman*, 127 S. Ct. 2842, 2853 (2007) (noting that "[t]he phrase 'second or successive' is not self-defining," but "takes its full meaning from [the Supreme Court's] case law, including decisions predating the enactment of [AEDPA]"); *United States v. Scott*, 124 F.3d 1328, 1329 (10th Cir. 1997) (noting AEDPA "does not define what is meant by 'second or successive'").  And "[t]he [Supreme] Court has declined to interpret 'second or successive' as referring to all § 2254 applications filed second or successively *in time*, even when the later filings address a state-court judgment already challenged in a prior § 2254 application." *Panetti*, 127 S. Ct. at 2853 (emphasis added).  In deciding whether a pleading should be deemed a second or successive pleading subject to 28 U.S.C. § 2244(b)'s restrictions, the Supreme Court instead looks to the purposes of AEDPA, which are "to further the principles of comity, finality, and federalism." *Id.* at 2854 (quotation marks omitted).  The Court has further indicated that "[t]hese purposes, and the practical effects of our holdings, should be considered when interpreting AEDPA.  This is particularly so when petitioners run the risk under the proposed interpretation of forever losing their opportunity for any federal review . . . ." *Id.* (quotation marks omitted) (addressing a situation where petitioners might forever lose review of their unexhausted federal habeas claims).  The Court has, thus, "resisted an interpretation of the statute that would produce troublesome results, create procedural anomalies, and close our

-66-

doors to a class of habeas petitioners seeking review without any clear indication

that such was Congress' intent."[18]  *Id.* (quotation omitted); *see also Castro v.*

---

[18]In other circumstances, the Supreme Court, as well as this court, has declined to require that a habeas petitioner meet 28 U.S.C. § 2244(b)(2)'s requirements for asserting a second or successive habeas petition, even though that petition was, in time, a second or successive challenge to a conviction.  *See Panetti*, 127 S. Ct. at 2848, 2852-53 (following *Stewart v. Martinez-Villareal*, 523 U.S. 637, 639, 643-46 (1998), and holding that a claim petitioner asserted under *Ford v. Wainwright*, 477 U.S. 399 (1986) — which prohibits executing an inmate who is insane — is not subject to 28 U.S.C. § 2244(b)(2)'s restrictions on second or successive applications for federal habeas relief, even when the petitioner failed to raise the *Ford* claim in his first habeas petition); *Yellowbear v. Wyo. Attorney Gen.*, 525 F.3d 921, 925 (10th Cir. 2008) (noting that petitioner's first habeas petition, asserted under 28 U.S.C. § 2254, was more appropriately characterized as a 28 U.S.C. § 2241 petition and thus holding that a later filed § 2254 petition was not a second or successive habeas application); *cf. Burton v. Stewart*, 549 U.S. 147, 153-54 (2007) (per curiam) (assuming, without deciding, that the Ninth Circuit's approach of deeming a habeas petition not to be second or successive if the petitioner "had a legitimate excuse for failing to raise his sentencing challenges" earlier, is correct; holding, however, that habeas petitioner in that case did not have a "legitimate excuse"); *Castro*, 540 U.S. at 377, 383 (relying on Court's supervisory power over lower federal courts to hold that a "court cannot . . . recharacterize a *pro se* litigant's motion as the litigant's first [28 U.S.C.] § 2255 motion *unless* the court informs the litigant of its intent to recharacterize, warns the litigant that the recharacterization will subject subsequent § 2255 motions to the law's 'second or successive' restrictions, and provides the litigant with an opportunity to withdraw, or amend, the filing).

Similarly, the Tenth Circuit has held generally that any habeas petition that does not result in an adjudication of the merits of the habeas claims, whether that adjudication be on procedural or substantive grounds, will not count as a first habeas petition for purposes of determining whether later habeas petitions are second or successive.  *See Haro-Arteaga v. United States*, 199 F.3d 1195, 1196 (10th Cir. 1999) (per curiam) (citing cases and noting, among other things, that, where first 28 U.S.C. § 2255 motion resulted in the reinstatement of the defendant's right to appeal federal conviction, AEDPA's second or successive restrictions did not apply to a later-filed § 2255 motion); *id.* at 1195-97 (holding AEDPA's second or successive restrictions did not apply to preclude § 2255

(continued...)

*United States*, 540 U.S. 375, 380-81 (2003).

In this unusual case, we conclude Mr. Douglas's *Brady* claim should be treated, not as a second or successive request for habeas relief, but instead as a supplement to his initial habeas petition. *See Cummings v. Sirmons*, 506 F.3d 1211, 1221 (10th Cir. 2007) (noting habeas petitioner in that case filed "supplemental" habeas petition in district court, adding two habeas claims), *cert. denied*, 128 S. Ct. 2943 (2008); *United States v. Guerrero*, 488 F.3d 1313, 1314, 1316-17 (10th Cir. 2007) (remanding to give inmate an opportunity to file an amended § 2255 motion to add claims that were not time-barred under AEDPA); *see also Espinoza-Saenz*, 235 F.3d at 504-05 (holding § 2255 movant can only amend § 2255 motion to add claims that are not time-barred under AEDPA). More specifically, we conclude Mr. Douglas's *Brady* claim supplements the prosecutorial misconduct claim he has asserted all along — that the prosecutor deprived Mr. Douglas of due process when, during closing argument, he vouched

_____

[18](...continued)
motion where petitioner filed, but then voluntarily withdrew, an earlier § 2255 motion); *Scott*, 124 F.3d at 1328-30 (holding second § 2255 motion was not a second or successive motion under AEDPA where district court granted first § 2255 motion, resulting in the district court resentencing the defendant who thereafter unsuccessfully challenged that sentence on direct appeal and then filed his "second" § 2255 motion); *Reeves v. Little*, 120 F.3d 1136, 1137-40 (10th Cir. 1997) (per curiam) (holding that, where petitioner's first § 2254 petition challenged the excessive delay in the Oklahoma courts in resolving petitioner's direct criminal appeal, his second § 2254 petition, filed after the Oklahoma courts resolved petitioner's direct appeal, was not a second or successive federal habeas petition subject to 28 U.S.C. § 2244's requirements).

for eyewitness Smith's credibility as we have discussed above.

Admittedly, we would not ordinarily permit a habeas petitioner to supplement his habeas petition in this way where, as here, his first habeas petition was already pending before this court on appeal from the denial of relief. In fact, the Tenth Circuit has previously held that even though a habeas petitioner is able to assert the new claim for habeas relief while his appeal from the denial of his first habeas petition is pending, the petitioner is not excused from having to meet § 2244(b)'s requirements for a second or successive habeas claim. *See Ochoa v. Sirmons*, 485 F.3d 538, 540-41 (10th Cir. 2007) (per curiam) (rejecting Second Circuit's decision to the contrary in *Whab v. United States*, 408 F.3d 116 (2d Cir. 2005)).

But the circumstances in Mr. Douglas's case are distinguishable from the situation this court addressed in *Ochoa*.[19] Here, under the unusual circumstances

---

[19]In *Ochoa*, the habeas petitioner, a state prisoner sentenced to death, filed his first federal habeas petition, the district court denied relief, and he appealed that determination to the Tenth Circuit. *See* 485 F.3d at 539-40. While his appeal was pending before this court, the United States Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304, 306-07, 310, 321 (2002), overturning its prior precedent and concluding that the Eighth Amendment precludes executing a mentally retarded defendant. In light of *Atkins*, Ochoa argued to this court that he should be permitted to pursue an *Atkins* claim without having to meet 28 U.S.C. § 2244(b)(2)(A)'s requirements for a second or successive habeas petition. *See id.* at 539. Section 2244(b)(2)(A) specifically addresses the situation presented in *Ochoa*, permitting a habeas petitioner to assert a second or successive habeas petition when "the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme

(continued...)

presented in this case, it makes sense to allow Mr. Douglas to supplement his

previously asserted prosecutorial misconduct claim with his *Brady* allegations,

which involve proven willful misconduct by the prosecutor in eliciting Smith's

false testimony at Mr. Douglas's trial, in using that false testimony to improperly

vouch for Smith's veracity to the jury during closing arguments, and in taking

affirmative action to cover up the tacit agreement the prosecutor made with Smith

in exchange for Smith's testimony against Mr. Douglas.  Because the prosecutor

acted willfully, and not just negligently or inadvertently, his conduct warrants

special condemnation and justifies permitting Mr. Douglas to supplement his

initial habeas petition.  "It has long been established that the prosecution's

'deliberate deception of a court and jurors by the presentation of known false

evidence is incompatible with rudimentary demands of justice.'" *Banks v. Dretke*,

540 U.S. 668, 694 (2004) (quoting *Giglio*, 405 U.S. at 153).

There are seven factors on which we base our conclusion that Mr. Douglas

can supplement his previously-raised claim of improper prosecutorial conduct

---

[19](...continued)
Court that was previously unavailable."  This court rejected the petitioner's
argument, concluding "that the pendency of an appeal from the denial of a first
petition does not obviate the need for authorization of newly raised claims" under
§ 2244(b)(2).  *Ochoa*, 485 F.3d at 539.  But in that case, unlike here, there was no
affirmative and egregiously improper action on the part of the government that
prevented the habeas petitioner from discovering and asserting his *Atkins* claim
any earlier.

with his *Brady* claim.[20]

*a. Mr. Douglas's initial habeas petition is still open and pending*

First, Mr. Douglas's initial habeas petition remained pending at the time he was able to discover and assert his *Brady* claim, albeit pending before this court on an appeal from the denial of habeas relief. Because Mr. Douglas's first habeas petition had never been finally resolved, to allow Mr. Douglas to supplement his first habeas petition in this manner would not be contrary to one of the recognized purposes of AEDPA — finality. *See Panetti*, 127 S. Ct. at 2854; *United States v. Mitchell*, 518 F.3d 740, 746-47 & 747 n.9 (10th Cir. 2008). Moreover, because the district court abated the habeas proceedings in order to permit Mr. Douglas to exhaust his newly-discovered *Brady* claim in Oklahoma state court, our allowing Mr. Douglas to assert that claim now also does not offend other recognized purposes underlying AEDPA — comity and federalism, *see Panetti*, 127 S. Ct. at 2854.

*b. Mr. Douglas's pending prosecutorial misconduct claim*
*is closely related to the Brady allegations*

Second, Mr. Douglas raised a claim in his first habeas petition that was

---

[20]We do not hold that a habeas petitioner must establish all of these factors in order to be able to supplement his initial habeas petition; instead, we conclude only that, in this case, these are the factors that persuade us such supplementation is justified here. But because it will be a rare case where such factors will be present, they serve to narrow significantly the circumstances that would justify permitting a habeas petitioner to supplement his first habeas petition in this same manner.

-71-

closely correlated to his later-discovered *Brady* allegations. Mr. Douglas has argued all along that the prosecutor deprived him of due process by improperly vouching for the credibility of the State's key eyewitness, Smith, before the jury during closing argument. Mr. Douglas just did not know *how* improper the prosecutor's vouching for Smith was until Mr. Douglas later discovered evidence that the prosecutor had an undisclosed agreement exchanging Smith's testimony against Mr. Douglas for the prosecutor's assisting Smith in numerous criminal difficulties. Miller knowingly elicited Smith's false testimony that he was not testifying against Mr. Douglas pursuant to any agreement with the government. Miller knowingly used that false testimony to argue to the jury that Smith's testimony was reliable. And Miller took affirmative steps, after Mr. Douglas's trial, to cover up the tacit agreement. *See Engberg v. Wyoming*, 265 F.3d 1109, 1112, 1116 (10th Cir. 2001) (treating claim alleging that government failed to disclose that it had attempted to use hypnosis to enhance a witness's recollection and claim challenging prosecutor's reference, during closing argument, that the witness was "one calm and collected lady" as "aspects of the single issue of the effect of the prosecution's failure to disclose police attempts to hypnotize [the witness]"); *see also United States v. Mangual-Garcia*, 505 F.3d 1, 10 (1st Cir. 2007) (considering whether prosecutor's closing argument could provide the basis for a *Napue* claim that the prosecutor knowingly elicited false testimony, but rejecting such a basis in that case because the prosecutor's argument was not

-72-

contrary to any evidence), *cert. denied*, 128 S. Ct. 2081 (2008); *Carriger v. Stewart*, 132 F.3d 463, 465-66, 481-82 (9th Cir. 1997) (en banc) (rejecting government's argument that habeas petitioner had failed to establish prejudice from a *Brady* violation, based upon prosecution's failure to disclose documents suggesting State's key witness was an habitual liar, where prosecutor strenuously vouched for witness's credibility during closing argument); *United States v. Udechukwu*, 11 F.3d 1101, 1102, 1105-06 (1st Cir. 1993) (granting relief from federal conviction, on direct appeal, where government failed to disclose the results of its investigation into information the defendant had provided regarding her drug supplier, and "prosecutor's closing argument deliberately suggested the contrary of the facts known to the government" following its investigation of the defendant's information; noting that "[h]ere we find a kind of double-acting prosecutorial error: a failure to communicate salient information, which, under *Brady* . . . and *Giglio* . . . should be disclosed to the defense, and a deliberate insinuation that the truth is to the contrary"); *Brown v. Wainwright*, 785 F.2d 1457, 1458 (11th Cir. 1986) (granting habeas relief where "prosecution knowingly allowed material false testimony to be introduced at trial, failed to step forward and make the falsity known, and knowingly exploited the false testimony in its closing argument to the jury"); *United States v. Bigeleisen*, 625 F.2d 203, 208-10 (8th Cir. 1980) (granting relief in part under *Napue*, based upon key witness's false testimony that he did not have an agreement with the prosecution to testify,

where prosecutor failed to correct that false testimony and instead made misleading closing argument to jurors from which they could have found that no such agreement existed); *United States ex rel. Wilson v. Warden Cannon*, 538 F.2d 1272, 1274, 1277 (7th Cir. 1976) (granting habeas relief where prosecutor knowingly used perjured testimony that witness did not have agreement with government to testify, "emphasized the nonexistence of any agreements in his questioning," and "stressed the nonexistence of any agreements in his closing argument"); *Powell v. Howes*, No. 05-71345, 2008 WL 4372632, at *6 (E.D. Mich. Sept. 22, 2008) (holding habeas petitioner's allegations that witness's "false testimony, the prosecution's failure to correct it, and the prosecution's affirmation of the testimony during closing arguments" stated a *Napue/Giglio* claim); *Tassin v. Cain*, 482 F. Supp. 2d 764, 773 (E.D. La. 2007) (noting that prosecutor's active participation in misleading jury, following witness's testimony that gave jury the false impression that witness faced up to ninety-nine years in prison, when in fact the witness, pursuant to an agreement with the prosecution, anticipated receiving only a ten-year sentence, is the "sort of capitalization upon misleading testimony by the state [that] clearly runs afoul of *Napue* and *Giglio*"), *aff'd*, 517 F.3d 770 (5th Cir. 2008); *Bragan v. Morgan*, 791 F. Supp. 704, 711, 712-15 (M.D. Tenn. 1992) (noting that prosecutor's ratification of false testimony prosecutor knowingly presented "is a clear violation of *Giglio*"); *cf. Byrd v. Collins*, 227 F.3d 756, 758 (6th Cir. 2000)

(Jones, J., dissenting from denial of reh'g en banc) (noting that the prosecutorial misconduct in that case was "symbiotic":  "The *Brady* violations produced an environment in which the testimony of convicted felon and jailhouse snitch Armstead could be credited; the [prosecutor's] vouching placed the State's seal of approval on Armstead's testimony; and the [prosecutor's] factual speculation created an imaginary evidentiary predicate to undergird Armstead's testimony. The combined effect of these various forms of misconduct eviscerated [defendant's] right to a fair trial."); *United States v. Ringwalt*, 213 F. Supp. 2d 499, 519, 521-22 (E.D. Pa. 2002) (using *Brady*'s materiality standard to analyze claim alleging that prosecutor made improper closing argument to jury, where prosecutor allegedly argued contrary to police interview notes which the prosecution did not disclose to the defense), *aff'd*, 66 Fed. App'x 446 (3d Cir. June 10, 2003) (unpublished).  "[T]he basic [tenet] of *Giglio* does not depend on whether misleading information was given to the jury in the form of a closing argument by a prosecutor rather than through the testimony of a witness." *Armour v. Salisbury*, 492 F.2d 1032, 1037 (6th Cir. 1974).

### c.  The prosecutor's misconduct here in violation of Brady/Giglio/Napue was willful and intentional

Third, the prosecutor's misconduct in Mr. Douglas's case was not merely inadvertent, but was instead willful and intentional.  A habeas petitioner can succeed on a *Brady* claim by establishing that the government suppressed

evidence material to the defense while acting either intentionally or inadvertently. *See Strickler*, 527 U.S. at 281-82. But in this case, Mr. Douglas has established more than just a *Brady* violation. He has been able to establish a *Giglio/Napue* violation — that the prosecutor knowingly presented false testimony. *See Giglio*, 405 U.S. at 153-55; *Napue*, 360 U.S. at 265, 269-72. Therefore, the prosecutor's conduct in this case warrants special condemnation. *Cf. Ringwalt*, 213 F. Supp. 2d at 522 (noting that, while prosecutor failed to disclose exculpatory evidence, that failure did not "undermine confidence in the criminal justice system" *because* "the conduct of government's counsel can not be described as intentional or constituting bad faith"). The prosecutor's knowing use of false testimony involves, not "just" prosecutorial misconduct, but "more importantly . . . [the] corruption of the truth-seeking function of the trial process." *United States v. Agurs*, 427 U.S. 97, 104 (1976). Under these circumstances, this court is obligated to censure such wilful prosecutorial misconduct.

### d. *The prosecutor's active concealment of his violation*

Fourth, and closely related to the third factor, it was the prosecutor's conduct in this case in taking affirmative action, after Mr. Douglas's trial, to conceal the tacit agreement the prosecutor had made in exchange for Smith's testimony that prevented Mr. Douglas from discovering the *Brady* claim in time to assert that claim originally in his first habeas petition. If Mr. Douglas had discovered this information even a few months earlier, he could have initially

-76-

presented his *Brady* claim as part of his first habeas petition and would be, procedurally, in the same position as his co-defendant Mr. Powell — entitled to habeas relief from his capital murder conviction. In light of these circumstances as we now know them, to treat Mr. Douglas's *Brady* claim as a second or successive request for habeas relief, subject to the almost insurmountable obstacles erected by 28 U.S.C. § 2244(b)(2)(B), would be to allow the government to profit from its own egregious conduct. *See Lopez*, 534 F.3d at 1034 (noting court was "not inclined to allow government in effect to profit from its failure to meet its obligations under *Brady*," and, therefore, construing appeal as request to file second or successive habeas application). And "[a] rule . . . declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Banks*, 540 U.S. at 696 (rejecting argument that "the prosecution can lie and conceal and the prisoner still has the burden to . . . discover the evidence so long as the 'potential existence' of a prosecutorial misconduct claim might have been detected" (quotation marks and citation omitted)). Certainly that could not have been Congress's intent when it enacted AEDPA. *See Panetti*, 127 S. Ct. at 2854 (noting that the Supreme Court has "resisted an interpretation of the statute that would 'produce troublesome results,' 'create procedural anomalies,' and 'close our doors to a class of habeas petitioners seeking review without any clear indication that such was Congress' intent'") (quoting *Castro*, 540 U.S. at 380-81).

-77-

The prosecutor's conduct at issue here, then, is akin to a fraud on the federal habeas courts; that is, the prosecutor took affirmative actions to conceal his tacit agreement with the state's key witness until it was too late, procedurally, for Mr. Douglas to use that undisclosed agreement successfully to challenge his capital conviction. In other circumstances, the Supreme Court has noted that fraud on a federal habeas court might exempt a petitioner from meeting the strict limitations AEDPA places on second or successive requests for habeas relief. *See Gonzalez v. Crosby*, 545 U.S. 524, 530-32 & 532 n.5 (2005) (noting that a habeas petitioner could properly assert a Fed. R. Civ. P. 60(b) motion for reconsideration of the denial of habeas relief, so long as that motion did not reassert previously argued habeas claims, or assert new habeas claims, but instead challenged the integrity of the federal habeas proceedings by, for example, alleging fraud on the federal habeas court); *Calderon v. Thompson*, 523 U.S. 538, 553-54, 557-58 (1998) (indicating a habeas petitioner could not seek to recall the mandate issued in an appeal from the denial of a first habeas petition, in order to permit the petitioner to assert a new claim for habeas relief; but further noting that this was "not a case of fraud upon the court, calling into question the very legitimacy of the judgment"); *see also Berryhill v. Evans*, 466 F.3d 934, 937-38 (10th Cir. 2006) (applying *Gonzalez*, but concluding in that case that a habeas petitioner's Rule 60(b) motion was not one challenging the integrity of the federal habeas proceeding, but instead presented a second or successive claim for habeas relief

-78-

that was subject to 28 U.S.C. § 2244(b)(2)(B)'s requirements).

While these "fraud on the court" cases do not directly apply to the circumstances of this case, they lend support to our decision to treat Mr. Douglas's *Brady* claim as part of his initial request for habeas relief. "Where a prisoner can show that the state purposefully withheld exculpatory evidence, that prisoner should not be forced to bear the burden of section 2244, which is meant to protect against the prisoner himself withholding such information or intentionally prolonging the litigation." *Workman v. Bell*, 227 F.3d 331, 335 (6th Cir. 2000) (en banc) (Merritt, J., dissenting). Further,

> fraud upon the court calls into question the very legitimacy of a judgment. That characterization of the situation which arises when the prosecution fails to reveal exculpatory evidence to the defense would seem to satisfy, at least in spirit, the requirement of section 2244. The difference between questions of fraud upon the court and ordinary newly-discovered evidence situations is that an allegation of fraud upon the court casts a dark shadow over the prosecution's intentions. The situation suggests that a judgment may have been reached with the assistance of a prosecutor who may not have had the intention of finding the true perpetrator. Such a judgment is inherently unreliable, and therefore satisfies the requirements of section 2244 in spirit.

*Id.*[21] Moreover,

_____

[21]This analysis garnered seven of the fourteen en banc votes available in this Sixth Circuit case. *See Workman*, 227 F.3d at 332. On this basis, seven Sixth Circuit judges voted to grant the habeas petitioner's motion to reopen a panel decision affirming the district court's decision to deny the appellant's first habeas petition, concluding the petitioner had established a prima facie case for asserting a second or successive *Brady* claim, and to remand for an evidentiary

(continued...)

> [p]rosecutors are subject to constraints and responsibilities that don't
> apply to other lawyers.  While lawyers representing private parties
> may—indeed, must—do everything ethically permissible to advance
> their clients' interests, lawyers representing the government in
> criminal cases serve truth and justice first.  The prosecutor's job isn't
> just to win, but to win fairly, staying well within the rules.  As
> Justice Douglas once warned, "[t]he function of the prosecutor under
> the Federal Constitution is not to tack as many skins of victims as
> possible to the wall.  His function is to vindicate the right of people
> as expressed in the laws and give those accused of crime a fair trial."
> *Donnelly v. DeChristoforo*, 416 U.S. 637, 648-49 (1974) (Douglas,
> J., dissenting).

*United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993) (other citations

omitted).  For similar reasons, in this case, which involves fraud perpetrated on

Mr. Douglas and analogous to fraud on the habeas court, we will permit Mr.

Douglas to supplement his claim alleging the prosecutor improperly vouched for

Smith's credibility with Mr. Douglas's newly-discovered *Brady* claim.

### *e.  This is a death penalty case, with special considerations*

Fifth, and importantly, this case involves the death penalty.  "[D]eath is a

different kind of punishment from any other which may be imposed in this

country."  *Gardner v. Florida*, 430 U.S. 349, 357 (1977).  Although we are

reluctant to create distinct rules applying differently to capital habeas

proceedings, we are also aware that the "qualitative difference between death and

[21](...continued)
hearing before the district court.  *See id.* at 332-38.  Another seven judges,
however, voted to deny that motion to reopen the panel decision.  *See id.* at 332.
Because the en banc court was evenly divided, the original panel opinion denying
the motion to reopen remained in effect.  *See id.*

other penalties calls for a greater degree of reliability when the death sentence is imposed," *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), as well as a heightened scrutiny in reviewing such a decision, *see Cartwright v. Maynard*, 822 F.2d 1477, 1483 (10th Cir. 1987) (*reh'g en banc*), *aff'd*, 486 U.S. 356 (1988). For these reasons, we apply a heightened concern for fairness in this case, where the state is prepared to take a man's life.

### f. Inequity in treatment between Mr. Douglas and Powell leads to the conclusion that death penalty for Mr. Douglas is capricious

Sixth, and building on the previous factor, "'[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.'" *Zant v. Stephens*, 462 U.S. 862, 885 (1983) (quoting *Gardner*, 430 U.S. at 358) (addressing decision to impose capital sentence); *cf. Gregg v. Georgia*, 428 U.S. 153, 188 (1976) (plurality) (noting that the death penalty's "uniqueness" requires that it not be imposed "under sentencing procedures that create[] a substantial risk that it w[ill] be inflicted in an arbitrary and capricious manner").

Here, there would be an obvious and unjustifiable inequity if we were to grant Mr. Douglas's co-defendant Mr. Powell habeas relief on the very same *Brady* claim on which we deny Mr. Douglas such relief. Given our conclusion regarding the prosecutor's similar agreement in both trials to assist the key witness in exchange for his testimony, it would constitute an arbitrary and

irrational decision to treat the cases differently that cannot be explained by either Mr. Douglas's culpability or his lack of diligence in pursuing his *Brady* claim. The only reason to deny Mr. Douglas habeas relief is that the government successfully prevented Mr. Douglas from discovering this *Brady* claim earlier by actively concealing the prosecutor's improper conduct. To reach such an arbitrary and irrational decision based only upon the degree of success the government achieved in covering up the prosecutor's egregious conduct would be to invite disrespect upon the judicial system. *Cf. United States v. Olano*, 507 U.S. 725, 731-36 (1993) (holding a defendant will be entitled, on direct appeal, to relief from a federal criminal conviction under Fed. R. Crim. Proc. 52(b), even though he did not raise the error before the trial court, if the error is plain and affected the defendant's substantial rights and where such error "seriously affects the fairness, integrity or public reputation of judicial proceedings" (quotation marks and alterations omitted)).

### g. *Relief is not inconsistent with AEDPA purposes*

Seventh, allowing Mr. Douglas to supplement his first habeas petition with his *Brady* claim does not implicate the concerns underlying Congress's enactment of AEDPA's severe restrictions on granting a habeas petitioner relief on second or successive petitions. *See* 28 U.S.C. § 2244(b)(2). Congress enacted AEDPA in part to "curb[] the abuse of the statutory writ of habeas corpus." *Montez v. McKinna*, 208 F.3d 862, 869 (10th Cir. 2000) (quotation omitted). In this case,

however, there is no indication that Mr. Douglas has, in any way, abused the writ or unnecessarily delayed his federal habeas proceedings. Instead, the record establishes that he acted with due diligence in pursuing his *Brady* claim once he discovered it.

Congress also enacted AEDPA to reduce delays in the execution of state and federal sentences, promote judicial efficiency, and conserve judicial resources. *See Panetti*, 127 S. Ct. at 2854; *Schriro v. Landrigan*, 127 S. Ct. 1933, 1940 (2007). But again, here, any delay, inefficiency, or waste of judicial resources stems from the prosecution, not Mr. Douglas. It cannot have been Congress's intent in enacting AEDPA to encourage the government to make and conceal agreements with its key witnesses until it is too late, preventing the habeas petitioner from asserting the existence of such secret agreements in his initial habeas petition and thereby insulating egregious government behavior from any habeas review.

Based upon these seven factors, we deem Mr. Douglas's *Brady* claim to be a supplement to his previously asserted claim alleging the prosecutor improperly vouched for Smith's credibility during the prosecutor's closing argument to the jury. Assessing the prosecutor's egregious conduct in light of the trial record leaves us with grave doubt about the validity of the jury's verdict and persuades us that Mr. Douglas is entitled to habeas relief from his capital murder conviction.

# V

## Conclusion

For the reasons set forth above, we **AFFIRM** the district court's decision granting Mr. Powell's petition for a writ of habeas corpus as to his convictions, subject to the state's right to retry Mr. Powell within a reasonable time. *See Fisher v. Gibson*, 282 F.3d 1283, 1311 (10th Cir. 2002). We **REVERSE** the district court's decision denying Mr. Douglas's petition for a writ of habeas corpus. We **REMAND** the case to the district court with instructions to grant the writ as to Mr. Douglas's convictions, subject to the state's right to retry him within a reasonable time. *Id.*